MARY GRACE, Appellant, v. MICHAEL CALLAHAN, Appellee.

FRAUD: Fiduciary Relations. A showing of long-continued inti-
1    mate relations between a nonassertive sister of but little education and experience, and a domineering brother of good education and wide business experience, may be sufficient to cast upon the brother the burden of proof to show freedom from fraud of a conveyance executed by the sister to the brother without consideration.

TRUSTS: Parol Evidence. While parol evidence is inadmissible
2    to *establish* an express trust in real estate, yet one who is admittedly the owner of real estate may, in *explanation* of his title, orally testify that his grantor never was the owner of the property, was simply a trustee for the one so testifying, and that the grantor's deed was simply in execution of the trust.

PRESTON, SALINGER, and STEVENS, JJ., dissent on the question of fact.

*Appeal from Dubuque District Court.*—J. W. KINTZINGER, Judge.

JULY 6, 1920.

ACTION in equity to cancel a deed. The facts are stated in the opinion. Decree for defendant. Plaintiff appeals.— *Reversed.*

*Hurd, Lenehan, Smith & O'Connor,* for appellant.

*Frantzen & Bonson,* for appellee.

STEVENS, J.—Plaintiff and defendant are sister and brother, and the daughter and son of Dennis Callahan, who died in March, 1916, 78 years of age, and without property.

1. FRAUD: fiduciary relations.

Cornelius Callahan, whose relation to the matters involved will appear presently, and who died in December, 1895, was the unmarried brother of Dennis.  On December 2, 1895, and about 10 days prior to his death, which followed an illness from which he was then suffering, Cornelius Callahan conveyed a tract of 400 acres, situated in Dubuque County, to Dennis Callahan, for a consideration of $6,000 and a further alternative agreement, recited in the deed and covered by an independent contract, to support the grantor so long as he should live, or pay him $600 annually for that purpose.  On January 30, 1904, Dennis Callahan conveyed all of said tract to the defendant herein, for a consideration of $1.00 and love and affection.  At the time of making the last conveyance, Dennis Callahan owned an additional 280 acres, in the vicinity of and adjoining some part of the 400-acre tract.  On October 15, 1912, he conveyed 240 acres thereof to the plaintiff, for a consideration of $1.00, care, and support during his life, together with the payment by her of all of his debts and funeral expenses.  The remaining 40 acres he had previously sold and conveyed to defendant, for a consideration of $1,200.  On May 9, 1913, the plaintiff conveyed 80 acres of the 240-acre tract to defendant.  The consideration recited in the deed is $1.00 and "other valuable consideration."  On May 21, 1913, Mary Callahan married Thomas Grace.  On September 24, 1913, plaintiff instituted this action, for the purpose of obtaining a cancellation of the deed from her to the defendant of the 80-acre tract.  The grounds upon which she bases her prayer for equitable relief are: (a) That the said conveyance was without consideration; (b) that it was procured by duress

and undue influence; and (c) that she was induced to execute the deed because of the confidential and fiduciary relations existing between her and defendant. Defendant denies that he obtained said conveyance by inequitable means, and avers that, prior to the conveyance of the 240-acre tract to plaintiff by her father, which conveyance was negotiated and consummated by the efforts of the defendant, it was agreed that they would subsequently make a just and equitable settlement between them of the property. Referring to the conveyance of the 400-acre tract to the defendant, he alleges in his answer that Cornelius Callahan conveyed the same to his father, in trust for him, and that the deed was executed to carry out the trust.

It is not claimed that the alleged trust was created in writing, or that it was enforcible under the statute. Defendant married in 1899, at the age of 23 years, and moved upon the 400-acre tract, where he has since continuously resided. Plaintiff's mother died when she was a small child, and she resided at home with her father and brother on the 240-acre farm until the marriage of the latter, and thereafter with her father, until after her marriage, in 1913. At the time of the trial, she was 44, and defendant 42 years of age. The farm is located near the parish church attended by both of them. The testimony is peculiarly lacking in detail, and the transaction complained of is quite out of the ordinary. The difference in the situation of the respective parties at the time the conveyance was made is significant. Defendant owned the 400-acre farm, worth in the neighborhood of $70,000, and plaintiff the 240-acre tract of approximately proportional value. Since old enough, plaintiff had performed the duties of housekeeper for her father, who did not marry after the death of plaintiff's mother, and had looked after and cared for him up to the time he went to live with the defendant, in 1913, which, she claims, was against her will. Defendant is vice president of a bank in Bernard, and, we gather from the record, a prosperous farmer. Plaintiff does not appear, however, to have been able to add substantially to the property received from her father.

She testified that she did not attend school after she was 11 years of age; that she has had little business experience; and that, up to the time of the trial, she had never been outside of Dubuque County, although she had made occasional, and perhaps frequent, trips to Dubuque and Bernard, for the purpose of visiting the stores and purchasing family necessities. She appears to be a woman of ordinary intelligence and ability, for one of her opportunity and experience. She further testified that she and her brother had always been on friendly terms, except that, upon two occasions, after they grew up, but years before the transaction in question, he struck her, but not violently, and in a fit of anger. The day before the deed was executed, she went to her brother's home, for the purpose of requesting him to take her to Bernard. He was absent; but, on the following morning, they went to town together. She testified that, while they were on the road to Bernard, she informed him of her approaching marriage; and that he then said to her that he thought they had better settle up, and that she should convey to him some of the land. Continuing her testimony, she said:

"My brother took me to Bernard. I went down to his house, a few days before that. I had some potatoes for him, and I wanted to go to Bernard. We had made a couple of trips to Bernard before that time. I wanted to get some household goods; but he didn't happen to be home that day, so I told his wife that I wanted to go to Bernard, and he came up the next day to take me to Bernard to get the things for the house, and on the way to Bernard, I told him I was to be married. So he asked me to settle up; he said I owed him some property. I don't know just what he did say, but I asked him how much it was, and how much he wanted; I think that was the way of it. He said he wanted about 80 acres. Of course, I was surprised. I did not answer him as to the 80 acres,—I was so surprised it was quite a shock to me, like."

She further testified that, when they arrived at Bernard, she ordered some groceries, and then went with defendant

to the bank to have some checks cashed; and that, while there; he took her into a room and introduced her to the cashier of the bank, of which he was vice president, who made out a couple of papers, which she signed,—one a quitclaim deed to the 400-acre tract; the other, of the 80-acre tract in controversy. She further testified that neither of the instruments was read to her, and that she did not know which 80 she was conveying to her brother. Defendant's version of the conversation on the way to town is as follows:

"I had a talk with my sister, before the deed was executed to me, in regard to these 80 acres of land. When we were going down to Bernard, I told her I heard she was going to be married. She said 'Yes,' and I said: 'Before you do, however, you had better make a little settlement with me, in order to have things in good shape.' She said, 'All right, what do you want?' I said, 'I would like to have that 80 acres adjoining mine.' She said, 'All right.' I said, 'You are satisfied now, are you, with that?' She said, 'Yes; I want you to be satisfied, too.'"

The above is the substance of their testimony, which is not materially varied or enlarged by cross-examination or by the further details. The defendant also testified that he induced the father to convey the 240 acres to plaintiff, in pursuance of an understanding between them that they could better care for him and handle the property in this way, and that they would later make a proper division or settlement between them. There is no evidence that the father was not willing to deed the farm to her, or that it was not done voluntarily, and in accordance with a desire to give it all to her. Upon this point, defendant testified:

"I remember the occasion of my father making a deed of all of this 240 acres to my sister. That was in October, 1912, I think. I had a talk with my sister, previous to the making of this conveyance, in regard to the property at her father's place. At that time, I lived about a mile from my father's. I brought the notary from Bernard. I had a few conversations with my sister in regard to my father's con-

dition, but I could not say how many,—in the neighborhood of five or six. Q. What were the nature of these conversations? A. In regard to his feeble condition. Q. At the time when the title to this property was placed in your sister, given by your father, state whether or not your sister knew of the circumstances under which it was placed in her. A. It was explained to her; she knew. Q. Where was this deed drawn up? A. At my father's house, my sister's home now. Joe Garrig and I were present. My sister wasn't present; she was outside. Besides this property, there was personal property conveyed at that time. * * * Q. In this conversation with your sister, prior to this deed and about the time this deed was made to her, was there any understanding between you and your sister in regard to the transaction of this property? * * * A. Yes. On account of my father's condition it had become time, we thought, to make some arrangements for his comfort, he not being able to work, and not being able to turn back to any business; and thought it better to have him sign it over to her, in order that she would be able to take better care of him, and it would make it easier for both of us to have the property in her name. We thought it was a good, safe way to do. * * * Q. And was there any understanding between you and she as to the settlement between you and her after your father's death, at that time? * * * A. Yes. Q. What was there as to that settlement? When did it take place? * * * A. When it would be most convenient for both of us, or when circumstances would permit, later on."

Plaintiff testified that her brother suggested to her that it was the thing to do for her to get the property in her name, but that she did not want to have it done. She denied specifically that there was any agreement or arrangement of any kind between them as to a future settlement or division of the property. Referring later to the transaction at Bernard, the defendant testified:

"This was while we were driving toward Bernard. I told her that, as I only had a quitclaim deed to my farm from

father, it would be nice if she would give me a quitclaim deed, too, she having a warranty deed for her property. And she said we could make the conveyance that day for all the deeds. Then we went down town. She went into the store, and bought household goods and groceries, etc. When she got through at the store, we went over to the bank, and I introduced her to Mr. Clark, and told him the nature of our business, and he wrote out the deeds according to the instructions, and we all talked it over, just the same as anybody else would be conveying property on good, agreeable terms, and we had the quitclaim deed to the 440 and the warranty deed for the 80 acres, and she signed them, without showing any disposition of not being inclined to do it in any way. If she did, I wouldn't insist on her doing it."

In so far as this testimony is inconsistent with the testimony of the plaintiff quoted above, it was contradicted by her. Defendant's testimony as to what occurred at the bank is corroborated in all material respects by that of the scrivener, who was not, at the time of the trial, employed by the bank, and who resided at Traer. Defendant, as indicated, does not claim that he purchased the land from plaintiff, or that she was paid anything more than a technical consideration therefor. The case is, therefore, unlike most of the cases cited by counsel, in which the plaintiff sought to set aside a conveyance upon the ground of inadequacy of consideration. The parties were competent to contract, and plaintiff, if she desired to do so, had a right to convey the land to her brother; and, after she has done so, it cannot be set aside solely upon the ground that she has repented of her act. Nor does defendant take the position that the conveyance was intended as a gift. His contention is that the deed was executed in pursuance of the alleged mutual arrangement and understanding arrived at between the parties before the land was conveyed to her.

It is conceded by the plaintiff that she took no part in the negotiations with her father resulting in the conveyance

of the land to her, nor did she take any part in the transaction at the time the deed was executed, except to pay him $1.00. On the same day the deed was executed, her father turned over to plaintiff some cows, horses, grain, sheep, machinery, and about $2,000 in cash.

Concerning her business experience and the relations between herself and defendant, plaintiff testified that, while her brother was at home, he sold the products of the farm and did the business generally; that she was not allowed to take part therein; that defendant was domineering, and insisted on having things done as he directed; that she did what he said, whether she wanted to or not; that he was quick-tempered; that he interfered with her upon two occasions, and objected to her marriage; that he suggested and induced her father to convey the farm to her; that the deed to the 80 was drawn up by the scrivener, and signed by her in ignorance of its contents; that she did not know what 80 was described therein; that it was not read over to or acknowledged by her; that he went with her to deposit the money in the bank at Dubuque; and that he looked after and advised her in business matters. Defendant admits that he assisted his sister when necessary, and when requested by her, but denies that he sought at any time to exercise any undue influence, or take advantage of her or the relations between them, and says that she signed the deed voluntarily, as requested by him. The cross-examination of several of defendant's witnesses developed that he is a man of strong, positive, and determined convictions, and likely to insist upon having his own way.

Shortly after plaintiff was married, the defendant requested that she deed him another 40, in consideration of his assuming the burden of caring for and supporting the father. This she refused to do. After this suit was begun, the parish priest requested plaintiff to come to the meeting; as, according to his testimony, he did the defendant, also. At this conference, attended by the parties and by the two priests, plaintiff admits that she agreed to dismiss the suit;

says she was afraid of the priests.  Concerning the meeting, the defendant testified:

"It was in October, 1912, that Mary and I were before these two priests at the monastery.  That was after the deed was made.  Father Placid requested me if I would talk with Mary and explain our case, and see if we could come to a settlement outside of court.  It was already in the court at that time.  I never talked with him about this suit until he asked me about it.  That was before she and I were there with this missionary and Father Placid.  It was arranged that this meeting should be at the monastery, if she was satisfied.  I suspected what it was for, but I didn't know what it was for.  Nobody went into details about it.  I knew they were going to have a talk, and I thought I would see what they had to say.  I was strictly cautious not to use any influence.  I knew before I went there that the purpose of this meeting was to discuss with her the claim she had against me in this suit.  I don't remember whether she or I was there first.  I don't remember that, when she came in, the door was locked.  Her husband wasn't there.  I don't remember whether he was invited or not.  I know he wasn't present during any of the time they asked her to drop it.  I don't know whether they urged her to drop it.  I don't know whether I urged her to drop it or not."

Both parties also testified that the details of the controversy were not gone into.  Defendant denied that the meeting was requested by him.  Some time after this occurrence, plaintiff wrote her brother a letter, complaining of his conduct and charging that he had designs on her property, and asking him not to plow up the 80-acre tract.  In this letter she said:

"I know how you made me say before two priests to give it up for peace sake; but I went right again my conscience and my husband, who is trying so hard to see that I am justified.  Why don't you come with your papers and witnesses and prove that you are entitled to one half of this property, and if your 400-acre farm was not papa's property,

why, then, did you take me before the Bernard banker and make me sign off?"

While mere inadequacy of consideration is never a ground for the cancellation of a conveyance, it has been held, in some cases, to constitute satisfactory evidence of fraud. *Herron v. Herron,* 71 Iowa 428; *Rarick v. Womer,* 184 Iowa 1016; *Derby v. Donahoe,* 208 Mo. 684 (106 S. W. 632); *Barker v. Wiseman,* 51 Okla. 645 (151 Pac. 1047); *Dotson v. Norman,* 159 Ky. 786 (169 S. W. 527); *Schwarz v. Reznick,* 257 Ill. 479 (100 N. E. 900).

Where confidential or fiduciary relations between the parties are shown, the burden of showing the good faith of the transaction is upon the grantee. *Reeves v. Howard,* 118 Iowa 121; *Jordan v. Cathcart,* 126 Iowa 600; *Detrick v. Patterson,* 159 Iowa 460; *Steen v. Steen,* 169 Iowa 264; *Herron v. Herron,* supra; *Earhart v. Holmes,* 97 Iowa 649; *Nesmith v. Platt,* 137 Iowa 292; *Schneider v. Schneider,* 125 Iowa 1.

Fraud is often difficult to prove, and is seldom established by the admissions of the party or by positive testimony alone. It may be, and usually is to be, found in the circumstances and the results of the transaction. As was said by Mr. Justice Weaver, in *Johnson v. Carter,* 143 Iowa 95:

"The trail of fraud is not always easily followed; and, while the law charitably prefers to sustain all business transactions which are reasonably explainable on the theory of fairness and honesty of all the parties concerned, yet courts are not at liberty to ignore clear and convincing indicia of bad faith, or refuse to draw inferences of fraud from circumstances which irresistibly point to that result."

It was also said by the Supreme Court of Illinois, in *Schwarz v. Reznick,* supra, that "whatever circumstances, when proven, convince the mind that the fraud charged has been perpetrated, is all that is required."

Transactions between parties of ordinarily equal opportunity and ability do not often result in one's securing an unconscionable advantage over the other. It is obvious that

plaintiff and defendant either dealt upon the basis of a prior mutual agreement and understanding, or that the former was the victim of gross imposition and fraud at the hands of the latter. It cannot be explained upon the ground that plaintiff desired or intended to bestow a gift upon her brother. He does not claim that. No claim is made by appellant that any false representations were made, or that defendant, by any immediate act or outward manifestation, exercised duress or undue influence in any form, to procure the execution of the deed.

As stated, plaintiff denies absolutely that she at any time agreed, before the deed was executed by her father, to convey any part of the land to defendant, or that the matter was discussed between them. If the 400-acre tract, in fact, was the property of Dennis Callahan, and not held by him in trust for the defendant, by the conveyance thereof to him he obtained a decided advantage in the distribution of his father's estate.

Counsel for appellant insist that the evidence offered upon the subject of the alleged parol trust was inadmissible. This evidence, upon the theory of counsel for appellee, was not offered for the purpose of establishing an enforcible trust in real estate, but only to explain the source of his title. In so far as such testimony might tend to throw light upon the disposition, division, or distribution of the property of Dennis Callahan between his children, or to show the relative situation of the parties, this evidence was admissible. Defendant could not be charged with inequitable conduct, if he were, in fact, the beneficiary of his uncle to the extent indicated, because he insisted upon a share of the property conveyed by his father at an advanced age in life, and shortly before his death. The testimony of the defendant relative to the alleged trust is not denied by witnesses, but there is much in the transaction and circumstances revealed, to cast doubt upon its reality. In the first place, Dennis Callahan, by the terms of the deed, agreed to

2. TRUSTS: parol evidence.

pay a consideration of $6,000, which he subsequently approximately paid in satisfaction of a mortgage upon the land at the time of conveyance. He assumed and agreed to support and maintain his brother, or to pay him annually $600 for that purpose. The market or actual value of the land, at the time it was conveyed, is not shown, but it is possible that Dennis Callahan contemplated that the profits and income he would derive from the land would more than offset the burden assumed by him; but the fact that the father paid $6,000 to discharge the mortgage, and obligated himself to pay $600 per year to his brother so long as he lived, for a conveyance of land in trust only, is not without significance. The recitals in the deed were supplemented by an independent contract, which was not introduced in evidence, nor its whereabouts satisfactorily accounted for. These papers were apparently prepared by a competent person, and it is strange, indeed, that they contained no reference to the alleged trust. Defendant testified to none of the details of his negotiations with Dennis Callahan, resulting in the execution of the deed of the 240 acres to plaintiff. So far as appears by the record, this conveyance may have been in pursuance of a settled plan on the part of the father, in making a division of his property between his children. However, he does not appear to have ever expressed such a purpose or desire to plaintiff.

In our opinion, the long-continued intimate relations between the parties, the difference in their opportunities and experience in business, the positive and determined character of defendant, as shown by the evidence, his disposition to control, and the fact that the conveyance was without a monetary consideration, afford sufficient evidence of fraud and undue influence to cast upon the defendant the burden of showing good faith in the transaction. *Forrestel v. Forrestel,* 110 Iowa 614; *Reeves v. Howard,* supra; *Jordan v. Cathcart,* supra; *Detrick v. Patterson,* supra; *Herron v. Herron,* supra; *Schwarz v. Reznick,* supra. As stated by the Supreme Court of Alabama, in *Cannon v. Gilmer,* 135 Ala. 302 (33 So. 659):

"It is well settled that courts of equity, in dealing with transactions between persons occupying fiduciary relations toward each other, are not confined to cases in which there is any formal or technical relations of that character, such as guardian and ward, parent and child, attorney and client, etc., but they apply the principles to all cases in which confidence is reposed by one party in another, and the trust or confidence is accepted under circumstances which show that it was founded on intimate personal and business relations existing between the parties, which gave the one advantage or superiority over the other, and that the burden of proving that the transaction was fair and righteous is on the one receiving or acquiring the benefit."

It is said by the New York Court of Appeals, in *Sears v. Shafer*, 6 N. Y. 268:

"A court of equity interposes its benign jurisdiction to set aside instruments executed between persons standing in the relations of parent and child, guardian and ward, physician and patient, solicitor and client, and in various other relations in which one party is so situated as to exercise a controlling influence over the will and conduct and interests of another. In some cases, undue influence will be inferred from the nature of the transaction alone; in others, from the nature of the transaction and the exercise of occasional or habitual influence."

In our opinion, the defendant has not met the burden cast upon him. It is quite true that fiduciary relationship cannot be predicated upon family ties alone, but there is much evidence in this case that plaintiff had all her life relied upon the defendant to aid and advise her, and she doubtless had come to depend upon his counsel and to repose confidence in his honesty and judgment; that he had, by his strong character and will, obtained such a mastery over her that she was unwilling or unable to resist his request to convey the land to him without substantial consideration. The judgment and decree of the court below must, therefore, be reversed.

What is said above is intended to express the views of the majority, as understood by the writer, who does not concur in the conclusion reached. In his opinion, the evidence of fraud, duress, and undue influence is too meager to justify the court in setting aside the deed. The writer is unable to perceive what evil motive could have actuated the defendant to procure the deed and personal property of the father to be delivered to plaintiff. His explanation that, at the time of this transaction, there was an understanding between him and plaintiff that they would, after the death of the father, make a satisfactory division, is the most rational, although perhaps not wholly satisfactory, explanation offered of the transaction. Defendant is doubtless a man of considerable business ability, and it is difficult to conceive that he would ask his sister to convey to him 80 acres of land without consideration, or that she would respond thereto without objection or protest of any kind. Much is made in evidence of plaintiff's lack of education and experience; but she was neither an imbecile nor so entirely without business experience or knowledge of the value of land in that county as to deed the 80 to her brother, merely because he requested it. In the opinion of the writer, the decree of the court below should be affirmed; but, as a majority think otherwise, it is—*Reversed.*

WEAVER, C. J., LADD, EVANS, and GAYNOR, JJ., concur.

PRESTON, SALINGER, and STEVENS, JJ., dissent.