JAMES T. RHODES et al., Appellees, v. STEPHEN L. UHL et al., Appellants.

FRAUD: Rescission Notwithstanding Examination. Rescission of
1 a contract of exchange is fully justified when the one rescind-

ing, being wholly inexperienced in land deals, exchanges land of large value for land of materially less value, on the strength of willfully false representations as to the value and quality of the latter land, and after an examination thereof which was manifestly so engineered as to prevent the examination from revealing the real truth.

MORTGAGES: Pre-existing Debt—Validity Against Defrauded 2 Grantor. A mortgage given to secure a pre-existing debt, without release of the debtor from personal liability, is of no validity against the plea of rescission by the victim of a fraud-induced contract of exchange.

ESTOPPEL: Wrongful Act of Escrow Holder. An owner of land 3 who places deeds, with grantee in blank, in the hands of a party to hold pending the final closing of an exchange, is not thereby estopped to dispute the validity of a mortgage arising out of the unauthorized act of said party in filling in his own name as grantee, and mortgaging the property.

*Appeal from Linn District Court.—*MILO P. SMITH, Judge.

JULY 6, 1920.

ACTION in equity to rescind a land trade. Opinion states the facts. Decree for the plaintiffs in the court below. Certain of the defendants appeal.—*Affirmed.*

*H. J. Maurer, Cook, Hughes, Sutherland & Taylor, Crissman & Linville, Voris & Haas, Clark & Clark,* and *O. N. Elliott,* for appellants.

*Trewin, Simmons & Trewin,* for appellees.

GAYNOR, J.—This action is in equity. It is brought to rescind and set aside a certain contract for the exchange of land. Involved in the exchange are the plaintiff's homestead and 320 acres of Texas land owned by the plaintiffs, and 126 acres of farm land owned by the defendant Miller. Plaintiffs base their right to rescind and have the contract and deeds canceled on the claim that the exchange

1. FRAUD: rescission notwithstanding examination.

was procured by fraud. The prayer of the petition is:

"That the contract entered into between the parties which evidenced the exchange and the deeds made in pursuance of the contract be canceled and set aside and held for naught, and that two certain mortgages placed by Miller upon the plaintiffs' homestead, in favor of the defendants Hedges and Kacena, be set aside and held for naught."

The court found in favor of the plaintiffs, canceled the contract and deeds evidencing the exchange, set aside the mortgage held by Kacena, and sustained the mortgage held by the defendant Hedges. Upon the trial of the case, the action as to Biggs, Cooper, and Cook was dismissed. The defendants Uhl, Miller, and Kacena alone appeal. Argument, however, has only been filed for Miller and Kacena, and the case here is narrowed to the issues between the plaintiffs and Miller and Kacena. Though Uhl appealed, he has filed no argument, and his appeal is not considered.

It appears that, prior to the 2d day of October, 1915, the plaintiffs were the owners of a certain house and lot in Cedar Rapids, owned, held, and occupied by them as a homestead, and also the owners of 320 acres of Texas land. The defendant was not then the owner of the 126 acres of land which he undertook to exchange for this property, but had some agreement by which he was to become the owner. The title to the land on the 2d of October was in Biggs. Biggs had made some arrangement to pass the title to the defendant Cooper, and Cooper had made some arrangement to transfer the title to the defendant Miller, but the title had not been transferred at that time. Though this fact is not material to this controversy, we state it because it has some bearing upon some phases of this case, as will be apparent hereafter. Prior to the 2d day of October, 1915, the plaintiffs seemed to have entertained a desire to exchange their homestead and their Texas land for farm land in Iowa. The defendant Uhl was a land agent. He discovered plaintiffs' desire, and came to them, in his capacity as real estate agent, and made some inquiry to

ascertain whether or not they were in the mind to exchange their properties for lands in Iowa, and found that they were. He took Mrs. Rhodes, one of the plaintiffs, to certain land which he had for exchange, and showed it to her. At that time she took her son-in-law along with her. The land was examined, but no exchange was made. We take it that, in the meantime, he had seen the defendant Miller, had discovered that Miller had 126 acres of land in question, and desired to sell or exchange the same. He gave to Miller a description of plaintiffs' property, and asked him whether or not he would be willing to exchange his property for plaintiffs' property, and was advised that, if a satisfactory exchange could be made, he would be willing to do so. Uhl then came to the plaintiffs, and arranged with them to go to see this Miller land, and arranged with Miller to accompany them. On the 2d day of October, these four parties took the interurban train to North Liberty, and from there they proceeded in an automobile to the land in controversy, and, on arrival, a partial examination of the Miller or Johnson County land was made. Before stating what was done on this visit, and before setting out to what extent the land was examined by these plaintiffs, we have to say that Rhodes, one of the plaintiffs, was, at that time, a man about 64 years of age, had never been engaged in farming, and knew practically nothing about the value of farm land. He was a conductor on the Rock Island Railroad, and had been with the railroad for about 45 years. This deal was his first experience. His wife was without experience in matters of this kind. They were then occupying the homestead in question, and had occupied it for about 14 years. The lot was 30 feet wide, fronting on First Avenue, and 117 feet deep. The defendant Miller was about 36 years old. Miller and Uhl were both men of large experience in matters of this kind. Both had been traders, Miller for himself, and Uhl for others. Miller seems to have had quite large experience in trading, both in stocks and lands. Just prior to this deal, he was in the merchandise business at Vancleve. Uhl's

business was to look out for deals, though it does not appear that he ever dealt for himself. Prior to this time, he had served Miller as agent. Miller testifies:

"The first time I ever saw Mr. Uhl was the time he had a man who had 320 acres of land south of Perry on trade for a stock of goods I had at Hedrick, Iowa. This was somewhere in the year previous to this deal."

Mrs. Rhodes testifies that Uhl represented this Miller property as a wonderful deal; told her that he knew the property; had seen it about three times. She details this introductory conversation in this way:

"He called me up, and said he had a most wonderful deal. He said, if I turned it down, he would never have anything more to do with me. He came to the house to see me, a short time before the second of October. He claimed that he had a farm in Johnson County, belonging to a man by the name of Miller, who had recently disposed of a large business in his home town, I think for $26,000, and that he wanted to come to Cedar Rapids to educate his children. He was looking for a home handy to school, and he thought that our place would suit him. I remarked that I thought it strange that, if he wanted our place, he didn't come and look at it. He replied, 'I have seen it, and he will take my word for it.' He told me that the Johnson County farm was a nice place, a nice piece of good land; that it was incumbered by a $9,000 mortgage. I had never heard of this man Miller until he was mentioned in the deal. I first met him on the morning of the 2d of October, when Mr. Rhodes and myself went with him to look at the land. We met Miller for the first time in front of the interurban station. Uhl was with him, and introduced him to me. We all went together to North Liberty on the interurban, secured an automobile, and drove to the land. On the way to the farm, Mr. Uhl, in the presence of Miller, repeatedly called attention to the farms along the road, and said that the Miller land was of the same character. As we drove in the automobile along the road on the south side of the land in controversy, he pointed to the land

across the road [this is known in the record as the Cochran land], and said that the land in controversy was of the same character as the Cochran land. [The Cochran land, it appears, was newly plowed, and showed a rich soil, and could be plainly seen from the road.] On the way, Mr. Uhl kept repeating what a wonderfully good opportunity this was, and what good land it was, and so on. He pointed to one piece of land, and said it had been sold for $168 an acre; that the land he was about to show us was equally as good. He made repeated comparisons. He placed the value of the land in controversy at $150 an acre. When we reached the farm, they drove us along the south side of this land [the road runs between this land and the Cochran land] to the southwest corner, and back then to the buildings, which were situated on the southeast corner. We approached the land from the east, along the south road. After we got out of the automobile, we went from 20 to 30 rods north of the house, a very short distance into the corn. The ground was soft, and it was not easy to get around. Uhl discouraged us from going north, saying that it was too bad and muddy,—not exactly muddy, but not good walking to go any further. He said the land north was all like the land around the buildings. The land around the buildings was fairly good land, and had corn on it. He kept telling us it was all like the land which we saw around the buildings along the road and to the south of the road; that it was all good land. He said the land was all capable of cultivation, and was good for raising crops."

It appears that the plaintiffs did not visit or examine the land to the north and northwest of the buildings. All the examination they made of it was of the land around the buildings at the southeast corner, and such examination as they were able to make by driving along the public highway on the south. The more reliable testimony tends to show that, from this point, the land north could not be seen,—at least could not be seen sufficiently to form any

judgment of its character or quality. It seems that there was a ridge that obscured the view from the road, and also corn along this road that prevented one from seeing fully the land to the north. It appears, also, that from the road there was a lane leading up into the land; that the plaintiffs suggested that the automobile be driven up there, so that they could see the land more fully, and were informed that it was impossible to drive up this lane, because it was so narrow that they could not turn around and get back. We have no hesitancy in saying that this record discloses that the plaintiffs, in their examination of this land, were, through the artifices of the defendants, confined in their examination to those portions of the land which presented its most favorable aspect. The plaintiffs made but a very casual examination of it, and were clearly led into believing that all the land was practically the same as the Cochran land to the south, and the land as it was found around the buildings.

As to the character of the land, there is some conflict in the evidence; but we have no hesitancy in saying that these representations, made by Uhl in the presence of Miller, and not contradicted by him, had no foundation in fact; that the land was not as represented, was not all tillable, was not like the land across the road, owned by Cochran, but most of it was wholly inferior to that shown to them on the south side and around the buildings. This being practically a fact case, we have set out somewhat at length the testimony of the witnesses touching its character, and a careful review of the whole record satisfies us that this testimony brings to the mind a fairly clear and accurate knowledge of the actual condition of the land. It is as follows:

One Leonard testified:

"A few days after the transaction involved in this suit, I visited the farm in controversy, with Mrs. Rhodes and daughter and J. H. Trewin. I was there at another time. The character of the land immediately around the buildings is the better part of the farm. It is all sandy soil,

but there is a good deal of dark loam in the soil. The soil is richer sand around the buildings than it is further back. As you go northwest of the buildings, you get into kind of a low marsh. Going north the first 30 rods, it is fair corn land. Then you drop into a lake bed, which is fairly rich soil, but undrained, and has water in it. The lake bed runs pretty near up to a ditch. You come then to the ditch. There are sand burrs on certain portions. Certain portions were so poor that it wouldn't grow sand burrs. The east half of the next 40, except right on the north line, is all barren sand. There was a marsh lying a little south of the northwest corner of the northeast 40, and that was wet, and had water on it. No drain through it. Bull grass growing in the marsh. South of the bull grass patch, there is a very poor quality of sandy land,—some corn on it, but very poor. The west side of the southeast 40 is outside the marsh land, excepting the south extreme part of it. Along the road there is a little marsh land, but the balance is better quality of corn land than on the north part or the west part. The patch of land immediately west of the buildings is medium corn land. The land along the south side is much better quality than as you get back 20 rods, except a little portion of marsh about where the ditch crosses over the field, and a few rods back, along the road. The land across the road is practically the same quality of land as the south part of this land, until you get back quite a way in the field on this land, coming north towards the ridge. The land across the road from this farm has just been plowed, at the time I was there. The soil turned up good corn soil. It was dark sandy loam. To walk over the sand ridge on the farm in controversy is to walk in sand burrs. There was a very little stand of corn. There was drift sand, or what you call blow sand. There was a ridge along this land, and on this ridge was absolutely no vegetation of any kind. When you walked on it, you were walking in sand, half way to your shoe tops. Over on the northwest corner of the same 40 there is another marsh, with just hay on it. One of the days I was there [this

was soon after plaintiffs' first visit], you couldn't walk through it, on account of its being wet and spongy. When you go east of the marsh along the north corner, or such a matter, you find nothing but sand. There was some grass on it, but mostly sand. There would be in the neighborhood of from 30 to 40 acres of that entire tract which would be reasonable farm land, if it were kept in shape. It would need drainage, and that ditch would need to be opened."

We may say, however, that there is some attempt on the part of the defendants to discredit this testimony; but we accept it as a fair basis for the conclusion that we reach in this case.

As to the value of the Miller land, the testimony is substantially as follows:

F. J. Cochran testified for the plaintiffs:

"I owned land in Johnson County at one time. I know where the land in controversy is. I own 426 acres of land across the road from this farm. I owned this land between 8 and 10 years, and operated it during that time. I know the farm in question. I have known it for about 12 years. This land lies on the north side of the highway, and mine was on the other side. The road runs east and west. The land in controversy lies on the north side. The buildings on the land in controversy are in the southeast corner. I know what lands are bought and sold for in that vicinity in years gone by. I would think the land in controversy was worth from $90 to $100 an acre."

W. F. Bickell testified that he examined the land in controversy. He testified:

"I am familiar with the value of lands generally. I would say a fair price for this land was $70 to $80 an acre."

L. C. Leonard, for the plaintiff, testified:

"I went over every part of the land in controversy. I spent the greater part of 3 days on the farm. The buildings are located on the southeast 40, along the highway on the south line, and within 15 or 20 rods of the east line. The land immediately around the buildings is the better part of the farm. The soil is rich and sandy around the

buildings. As you, go northwest of the buildings, you get into kind of a low, marshy land. Going north from the buildings for the first 30 rods is fair corn land. Then 'you drop off into a lake bed. Then you come from that to a ditch. Then you come to the poorest, sandiest land I have ever seen in Iowa, with few exceptions. The land along the road on the south side of the farm is much better quality than it is when you get back 20 rods. The land along the road is practically the same quality as the land south of it, and this is so until you get back quite a way north in the field, going towards the ridge. There is in the neighborhood of 30 to 40 acres on the entire tract that would be reasonably fair farm land, if it was kept in shape. The north and east part of the 40 won't produce the ordinary crops of this country. I am familiar with the value of lands in Iowa. I have owned lands in several counties. I made inquiry as to the value of lands in this neighborhood, and talked with neighbors, and found what lands were sold for in that vicinity."

He was asked this question:

"Now, from your investigation and your knowledge of the soil and of farming, what would you say as to the fair value of this tract of land per acre, including the improvements? A. About $80 to $85 an acre. My examination of this land was made soon after this transaction occurred."

Henry Lonvar testified for the defendants:

"My farm was across the road on the south side from this 120 acres. I bought it from Mr. Cochran, and paid $130 an acre. The farm was 386 acres."

He testified that the value of the land in controversy was $130 an acre. He said:

"I never walked over the north 40. I don't know anything about it at all. I never have been over where the scrub brush is. Never walked over this sand ridge. I don't know whether there is a sand ridge there or not. I just drove around the road. I didn't see any sand blow there. I looked, and I didn't see any sand blow."

Albert Kochyaka, called for the defendants, testified:

"My house is right across the road from the southwest corner of the land in controversy. I have lived there 5 years. I have been renting the farm for 5 years. I went across the corner of the southwest part, a couple of times, then I crossed the middle of the farm, and helped thresh. I have been back across the north 40. I have been on the 40 on which the house is located. The Cochran farm is right east of me."

He was asked:

"Are you familiar with the value of the farm on which you live and have lived for the last 5 years,—how much per acre is it worth? A. $135. I never bought or sold land in that vicinity. I don't know the values of land there. The soil on the land in controversy is about the same as the soil on the land that I occupied."

Joseph Novak, called for the defendants, testified:

"I have been all over the land in controversy. My land is on the north side of the ridge, as is this land, and the west boundary of my farm is the east boundary of the farm in controversy. The two farms join. I have owned land there for the last 18 years. I have an opinion as to the value of the land in that vicinity. I think the land in controversy was worth $125 to $130 an acre in October, 1915."

C. H. Cherry testified that he was associated with the Cherry Realty Company, real estate agents. He said:

"I am familiar with the land in controversy. Have been over it, and was acting in connection with the trade between Biggs and Cooper. I have been engaged in handling land in that vicinity for 4 years. I made an examination of the land in controversy. Know the character of the soil. Its value in October, 1915, was $120 or $125 an acre."

After this casual examination of the land, the plaintiffs returned, with Miller and Uhl, to North Liberty, there to take an interurban car for Cedar Rapids. They were there for some little time. During this time, Miller separated himself from the party, assumed an attitude of in-

difference to the matter in hand, and began playing horse-shoes. We assume that this gave to Uhl a pretext for saying to the plaintiffs that Miller was indifferent to the exchange; that he was not anxious to make the trade; that, unless they secured him now, he might not later be willing to make the trade. They then took the interurban car to Cedar Rapids. That evening, Uhl gathered the plaintiffs and Miller in his office, and there, by impressing upon the minds of these plaintiffs the desirability of consummating the trade, induced them to enter into a written contract, by which they undertook to exchange their home and their Texas land for Miller's 126 acres in Johnson County. At that time, in order to make it appear that the matter was binding, Miller executed a check for $500, to be forfeited in the event he failed to perform, and the plaintiffs executed their check for $500, conditioned the same way. These papers were then placed in an envelope, sealed up, and taken to a bank, and deposited there for safe-keeping. We take it, although it is not in controversy here, that the plaintiffs did not, at that time, fully make up their minds that the deal would be consummated, although they were strongly impressed with the representations of Uhl, made in the presence of Miller, that the deal would be very advantageous to them.

As said before, this contract and these checks were placed for safe-keeping in a bank. The second of October was on Saturday. Miller immediately proceeded then to consummate his deal with Biggs and Cooper, and got evidence from them of his interest in the Johnson County land. Early the next week, Uhl came to the plaintiffs, presented a deed executed by Cooper, covering the 126 acres in Johnson County, and induced plaintiffs to make deeds in blank to their homestead and their Texas land. These deeds were taken by Uhl, though the plaintiffs understood that they were taken simply for safe-keeping, until the deal was consummated. Under some arrangement between Uhl and Miller, Uhl's name was entered in plaintiffs' deeds as grantee. Thereupon, Uhl proceeded at once to mortgage

the homestead in his own name. He obtained $1,000 on one mortgage and $2,000 on another mortgage. These are the mortgages under which Hedges and Kacena are making claim. Plaintiffs' deeds had not then been recorded. Uhl secured the money on these mortgages through the defendant Cook. It seems that Cook negotiated the mortgages for Uhl, who was acting under some arrangement with Miller. Hedges parted with the money on his mortgage. Kacena simply canceled an old debt which he owed Cook, or rather, surrendered the evidence of an old debt. He parted with no money. He still holds Cook upon the old debt. These are the mortgages which plaintiff seeks to cancel. The court canceled the Kacena mortgage, in so far as it was a lien upon plaintiffs' homestead. A portion of the money that was obtained on the Hedges mortgage was returned by Cook and deposited with the clerk, and the plaintiffs were given credit on the Hedges mortgage for the amount so paid, and the plaintiffs were given judgment against Miller and Uhl for the balance of the mortgage which this money did not cancel, and title quieted in the plaintiffs against all the defendants, except as to the Hedges mortgage. Plaintiff has not appealed; so that matter is not in controversy here.

This presents practically the situation of the parties and the controversy at the time the cause was finally submitted to the court.

We have not set out in detail the transactions between Miller and Uhl which tend to show very strongly to our minds that, in all this deal, Uhl and Miller were walking hand in hand, although this is positively denied by both Miller and Uhl. The rights of these parties are not to be judged by the technical relations existing between them, but rather by the real relationship to each other and to the subject-matter, as made manifest by their conduct. Their conduct and the circumstances that attended the whole transaction convince us that Uhl was more the servant of Miller than he was the servant of the plaintiffs in the whole transaction, and that Uhl was seeking Miller's

advantage, rather than the advantage of these plaintiffs, in what he did. We are satisfied that both Uhl and Miller took an unfair advantage of these plaintiffs. Through their conduct, they led these plaintiffs to believe that the land was other and different from what it was. The haste with which they sought to consummate the deal, after the slight examination that was permitted to these plaintiffs, suggests that they had in mind that further examination and further consideration on the part of these plaintiffs might lead them away from the consummation of the deal. Miller knew this land, yet permitted Uhl in his presence to make these statements touching the character and quality of the land which he must have known at the time were absolutely false. If Uhl had visited this land, as he told the plaintiffs he had, he, too, knew that they were false. If he did not know, then he willfully stated that to be true which he did not know to be true, and stated this in the presence of Miller. That plaintiffs will be wronged and defrauded, if held to this contract, is apparent. Giving the best consideration that can be given to the testimony as to the value of these respective properties, we find the homestead to be worth $4,000. The fair valuation of the land in Texas would be $7.00 an acre. This valuation is fair to the defendants, and we fix it at $2,240. Adding $4,000 for the house to this, we have the consideration to be paid by the plaintiffs for this Johnson County land to be $6,240. The Johnson County land, at the best figures for the defendants, would not exceed $100 an acre. This would make $12,600. On this there was a mortgage of $9,000, leaving a balance of defendants' equity of $3,600. If we should assume defendants' figures as a basis for computation, we would be marveling here at their eagerness to force the contract upon the plaintiffs; for, if defendants' figures and the estimates placed by their witnesses should control, plaintiffs would have somewhat the better of the bargain. We think the court was justified in setting aside the conveyance as to Miller and Uhl, and in canceling the $500 checks given

by each of the parties at the time the contract was entered into.

The general rule is that the fraud which justifies a setting aside of a contract may be evidenced by acts, as well as by speech. Omission to act, when honesty and good faith would require action, and concealment, when such concealment is a breach of either a legal or an equitable duty to expose, may constitute fraud. A misrepresentation which justifies the setting aside of a contract is a representation of a fact which, if accepted, leads the mind to a conprehension of a condition other and different from the one which exists. Colloquially, it is understood to mean a statement made to deceive or mislead. Any statement made of a substantive fact, or any conduct which leads to a belief of a substantive fact material to the proper understanding of the matter in hand, made with intent to deceive or mislead, and thereby secure undue advantage, involves in it the elements of fraud; and fraud vitiates all contracts. A contract will be set aside, even though the fraudulent statements were innocently made, if they are, in fact, fraudulent, and acted upon, when it is made to appear that the other party relied upon them as true, and acted upon the belief that they were true, and the other party had reason to believe that he was so relying, at the time the transaction occurred. It would hardly seem necessary to cite authorities in support of these propositions; but see *Severson v. Kock*, 159 Iowa 343, and cases therein cited. The general rule is that gross inadequacy of consideration is evidence of fraud. It tends at least to show that the party relied upon the statements made in the transaction. It has been said:

"Ordinarily, equity has jurisdiction to rescind a contract, where an unconscientious advantage has been taken by one of the parties of the condition or circumstances of the other party, especially where there is gross inadequacy of consideration, or where there has been imposition or oppression practiced upon a person reposing confidence in the party who has abused it. * * * While it is not the

function of the courts to make contracts for parties, or to relieve them from the effects of bad bargains, nevertheless, where the simplicity and credulity of people are taken advantage of by the shrewdness, overreaching, and misrepresentation of those with whom they are dealing, and they are thereby induced to do, unwittingly, something the effect of which they do not intend, foresee, or comprehend, and which, if permitted to culminate, would be shocking to equity and good conscience, a court of equity may with propriety interpose." See 4 Ruling Case Law 502; *Herron v. Herron,* 71 Iowa 428.

People do not part with their property, ordinarily, for a grossly inadequate consideration; and, while inadequacy of consideration is not a ground always for setting aside a conveyance, it has its probative force in corroboration of testimony tending to show that fraud was, in fact, practiced to induce them to do so. See *Nagel v. Davis,* 162 Iowa 349; *Fulton v. Fisher,* 151 Iowa 429. As a general proposition, we find the rule stated in 12 Ruling Case Law 235, 236, as follows:

"The relative circumstances and conditions of parties to an alleged fraudulent contract should be considered in determining the question of fraud; as, where one of the parties is an artful, shrewd, business man, and the other aged, ignorant, and imbecile. * * * But the mere fact that a person is unlearned and ignorant * * * affords no ground of relief in equity, unless it also appears that he relied for information upon the person against whom relief is sought, and that the latter misrepresented the state of the facts."

It has been said that:

"The trail of fraud is not always easily followed; and, while the law charitably prefers to sustain all business transactions which are reasonably explainable on the theory of fairness and honesty of all parties concerned, yet courts are not at liberty to ignore clear and convincing indicia of bad faith, or refuse to draw inferences of fraud from cir-

cumstances which irresistibly point to that result." *John-son v. Carter,* 143 Iowa 95.

As bearing upon this question, see *Vaupel v. Mulhall,* 141 Iowa 365; *Hibbets v. Threlkeld,* 137 Iowa 164. As was said in *Castle v. Bullard,* 23 Howard (64 U. S.) 172:

"Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."

As bearing upon this question, see, also, *First Cong. Church v. Terry,* 130 Iowa 513; *Connors v. Chingren,* 111 Iowa 437; *McCreary v. Skinner,* 75 Iowa 411; *Bixby v. Carskaddon,* 55 Iowa 533.

This brings us to a consideration of the contention of the defendants that the plaintiffs had a fair opportunity to examine the land before they made their contract, and, therefore, ought not to be heard to say that they did not know the character of the land, and were deceived by the representations made by the defendants.

Against this contention, the law says:

"Although the purchaser may have available means of ascertaining the truth, yet, if the vendor, by any misrepresentations or by any trick or artifice, induces him to forbear inquiry or investigation which he would otherwise make, and thus to rely solely on the vendor's false statements, the rule of *caveat emptor* does not apply, and the purchaser may hold the vendor liable. And since such practices are obviously calculated only to mislead the purchaser by producing an erroneous impression upon the mind, and thus lulling him into a false security, they may, of themselves, well be deemed to amount to actionable fraud, where they succeed in producing the desired result [as they did in this case]. The very representations relied upon may have caused the purchasers [plaintiffs] to forbear making inquiry, and in such a case the vendor [defendants] will not be heard to say that the falsity of his statement might have been ascertained."

The mere fact of investigation or opportunity to in-

vestigate does not necessarily deprive one of the right to rely upon representations, and this is especially true where the one making the representations is assumed to have knowledge that is not possessed by the other, and which could not be obtained except by actual investigation, and he makes these representations to induce the other not to make investigation, and succeeds by such representations in restraining him from making investigation, knowing that he is relying upon the statements made by the party sought to be charged. See 20 Cyc. 61, 62; *Mattauch v. Walsh Bros.,* 136 Iowa 225; *Brett v. Van Auken,* 99 Iowa 553; *Franke v. Kelsheimer,* 180 Iowa 251, 256. So we say that, under the law as written, the plaintiffs were entitled to the relief prayed for against the defendants Miller and Uhl.

This brings us to a consideration of the Kacena mortgage; and, without elaboration on this point, we think the court was right, that the Kacena mortgage could not be

2. MORTGAGES: pre-existing debt: validity against defrauded grantor.

sustained, against the rights of the plaintiffs in this suit. As bearing upon this question, see *Lillibridge v. Allen,* 100 Iowa 582; *Phelps v. Fockler,* 61 Iowa 340; *Senneff v. Brackey,* 165 Iowa 525; *Smith v. Moore,* 112 Iowa 60; *Port v. Embree,* 54 Iowa 14; *Rea v. Wilson,* 112 Iowa 517.

Plaintiffs were not estopped to assert their rights, as against this mortgage, by anything that they did. They had no knowledge of the purpose to which Uhl was put-

3. ESTOPPEL: wrongful act of escrow holder.

ting the mortgage. The deeds were in blank, left with Uhl for safe-keeping. Uhl wrongfully inserted his own name, without the knowledge and consent of these plaintiffs, and proceeded immediately, and before any abstract was secured, and before plaintiffs had consented to the final consummation of the deal, to negotiate these mortgages through Cook, for the use and benefit of Miller. There is no element of an estoppel in this case. Plaintiffs had no chance to speak, and their silence cannot be held against them. They had no notice of what Uhl was doing, and did nothing to induce the mortgagees to act, either by silence

or overt act.    This rule of estoppel applies only to cases where the person charged has made a third party his real or apparent agent, or where he provides the means of committing a fraud intentionally, or for dishonest purposes, or where he ·derives and retains the benefit of the fraud of a third person.    Estoppel cannot be invoked to do fraud. Its purpose is to prevent fraud.    Mouths will be shut only when necessary to do justice, and never where it would operate as a fraud or effectuate injustice.    Further, one of the essential elements of estoppel is that the person invoking it has been influenced by a reliance upon the representations or conduct of the person sought to be estopped. These deeds were not made to Uhl by the plaintiffs.    They were delivered to him for safe-keeping.    They had no notice that Uhl had inserted his name.    They had no notice that he intended to use them for the purpose of securing money upon this property.    The deeds were not shown to Kacena, at the time the money was loaned.    The deeds were not on record.    Kacena simply took the statements of Cook or Uhl, whichever it may be, and relied upon them, and these statements, under this record, if shown to be made by them, are wholly false.    Uhl did not have the title to this property, nor was it ever the intention of these plaintiffs to put the title in Uhl.

We are satisfied with the conclusion reached by the court in this case, and its action is, therefore,—*Affirmed.*

WEAVER, C. J., LADD and STEVENS, JJ., concur.