JOHN F. WEBBER, Appellee, v. D. H. KING et al., Appellants.

MARCH 6, 1928.

*Chester W. Whitmore,* for appellants.

*John F. Webber, Jones & White,* and *Clyde G. Sparks,* for John F. Webber and H. G. Wetherell, appellees.

*McCoid, McCoid & McCoid,* for John Mitts, appellee.

KINDIG, J.—An understanding of the legal problems here

614

involved can best be had by first reciting the preliminary facts forming the basis thereof.

Harriet C. Linder is the mother of D. H. King, and both are defendants and appellants; while D. H. is the husband of Bessie A. King, who is also a defendant and appellant. Mrs. Linder held a life estate in the land concerned, and the remainder therein was owned by her son, D. H. King. That acreage, during all the times here material, was incumbered by a first mortgage of $53,000, due March 1, 1925. Then, on the 7th day of October, 1922, D. H. King and Harriet C. Linder, appellants, executed, made payable, and delivered to appellee John F. Webber six promissory notes, due March 1, 1925, in the following denominations: Four each for $5,000, and two in the amount of $3,000 apiece. To secure this indebtedness, totaling $26,000, said makers of the notes executed and delivered to the payee thereof a second mortgage on the real estate. When the due date arrived for these mortgages, the interest was delinquent on both, and the taxes on the farm remained unpaid. Thus the appellants continued in default, so that, on July 24, 1925, appellee Webber commenced this action in the district court, praying for the foreclosure of the second mortgage and the appointment of a receiver to collect "the rents, issues, profits, and income," as provided in the security agreement. Afterwards, amendments were filed and proceedings had, to the extent that the cause was not finally determined until the 18th day of March, 1926, at which time, after trial, the judgment and decree was rendered, granting the relief asked.

No objection is made to that part thereof effecting the foreclosure, but appeal is taken from the action of the district court relating to the "appointment of the receiver" and the amount of the debt allowed.

Seven grounds are named for reversal, and these will now be considered in the order set forth.

I. At the outset, it is argued by appellants that a "receiver" was not rightfully allowed, because the mortgagors, D. H. King and Harriet C. Linder, had rented the premises to the defendant and appellee John Mitts for the years 1925 and 1926, which lessee, in consideration of the demise, had executed, made payable, and delivered to D. H. King four promissory notes, as follows: The

first for $1,600, second, $3,425, third, $1,500, and fourth, $1,500, due respectively September 1, 1925, January 11 and September 1, 1926, and January 1, 1927. Consequently, it is said that the receiver is not entitled to the crops produced for those years, because they belong to the tenant, nor can he have the "notes," it is asserted, for the reasons: First, that the instrument for $3,425 was negotiated to one Mrs. John Bragg, for $3,000 cash, who, on February 15, 1926, met appellee Mitts and appellant King at Ottumwa, where it was arranged that 2,000 bushels of corn raised during the year 1925 should be segregated in a separate crib on the place for Mrs. Bragg, and the grain was to remain there until July, 1926, when it was to be hauled to market by Mitts, and the proceeds applied on said "note." Second, suggestion is made that the $1,600 item was canceled and the evidence of indebtedness returned to Mitts July 14, 1925, through an accounting arrived at between King and Mitts; third, explanation is made that the $1,500 due September 1, 1926, was transferred and delivered to one Gladys Ruble, as a part payment for her interest in certain property; and fourth, the $1,500 due January 1, 1927, it is said, was, on July 20, 1925, sold and transferred by King to one Dale Hupp, for the balance due on a painting account.

Replying to this defense, Webber insists that the negotiation of the "notes" is entirely immaterial, for the reason that the "lease" was fraudulent and invalid to the extent that it has no existence, in fact, and the "crops" raised for the two years in question belong in truth to appellants, D. H. King and Harriet C. Linder. Parenthetically, it is observed that the good faith in transferring these negotiable instruments is questionable, and the record discloses great doubts as to the validity thereof. However, because of the position taken by appellees, we do not pass upon that issue, but confine our investigation to the point having to do with fraud, making the "lease" invalid.

Permeating the record are many unusual and suspicious circumstances, contradictory statements, unexplainable positions, and other facts suggesting and finally leading to the conclusion that good faith was lacking, and that appellant D. H. King, acting for himself and Harriet C. Linder, and appellee John Mitts, through collusion concocted a scheme to defraud appellee Webber by pretending that the "lease" was real and

valid, when in fact it was a mere pretense, or "phony," to cover up the products of the cultivated ground and thus defeat the receiver's right thereto. Commencing with the status of the obligations March 1, 1925, it is recalled that the first and second mortgages were both due, the interest was far in arrears, and the taxes delinquent. Date of the pretended "lease" was March 4, 1925, and no explanation was given for the belated arrangement. Previously, however, the mother had told her son to recover all he could out of the wreck, and on his mind were the delinquencies, the demands for payment, and the threatened foreclosures.

Mrs. Linder and D. H. King were insolvent; in fact, the latter had recently been discharged in bankruptcy, and the security was worth far less than the mortgage indebtedness. There was some talk of transferring title to appellee Webber by deed, but no final decision in that regard was ever reached. Prior to March 4, 1925, the "tenant" had been living upon the premises as a mere employee of appellants'; for, during previous years, King had operated the farm through a hired man, and had kept thereon machinery and live stock therefor. Apparently no change took place under the new system. Mitts was not financially responsible, and without means of equipping himself for agricultural operations; for in fact he had money enough only "to keep" him "alive for a month or two." A two-year term for 457½ acres was in jeopardy because there was no security for approximately $8,500 in rents. D. H. King admitted that he never proceeded that way before. According to the terms, the tenant was to pay $5,025 for 1925, but only $3,000 for 1926. King made no explanation of this difference, but Mitts attempted to do so on the theory that part of the premises, when taken over, was planted to wheat, the fall before, yet he threshed only 783 bushels therefrom. Such undertaking on the part of a poor tenant is unreasonable and unlikely; because, in such event, he would not ordinarily invest $2,000 in that amount of fall wheat on March 4th, having no assurance of either the yield or the price at that early date.

Singular, too, is the accounting for the $1,600 rent note due September 1, 1925, which was returned by King to Mitts, July 14th of that year, only a few days before the institution of this action. Contradictory and confusing statements are made about

this, and reference given to a memorandum book, which the record suggests was devised for the occasion. Being confronted with inconsistency, the witness proceeded to change his testimony.

Similarly, the evidence discloses unbelievable suggestions concerning the payment of the $1,600 note through the sale of immature corn,—in fact, only waist-high,—and other like unusual incidents relating to the hiring of a pasture at a time when there was no stock demanding it. Continuing for illustration, it is claimed that Mitts sold King a wheat straw stack before the grain had been harvested: that is to say, the subject of the bargain had no existence. Many more analogous absurdities could be set forth regarding the sham consideration for the "notes" and the execution of the "lease;" but, if this opinion is to be confined within reasonable bounds, it is impossible to do so.

II. Fraud will not be presumed. Nevertheless, clear and convincing evidence of bad faith cannot be ignored, nor can the court refuse to draw proper inferences from "facts and circumstances" pointing irresistibly to "fraud." *Johnson v. Carter*, 143 Iowa 95; *Grace v. Callahan*, 189 Iowa 213; *Rhodes v. Uhl*, 189 Iowa 408. *Johnson v. Carter*, supra, contains this apt language:

"The trail of fraud is not always easily followed, and while the law charitably prefers to sustain all business transactions which are reasonably explainable on the theory of fairness and honesty of all parties concerned, yet courts are not at liberty to ignore clear and convincing indicia of bad faith, or refuse to draw inferences of fraud from circumstances which irresistibly point to that result."

Again in *Grace v. Callahan*, supra, we said:

"Fraud is often difficult to prove, and is seldom established by the admissions of the party or by positive testimony alone. It may be, and usually is, to be found in the circumstances and the results of the transaction."

Concededly, appellants had a perfect right to enter into a valid lease at the time in question (*Hakes v. North*, 199 Iowa 995); but we are constrained to hold, under the facts revealed by this record, that good faith in the case at bar was lacking, and that the contract of tenancy was a mere pretensé, and, in

618

fact, had no validity, for it was created with the intent to deceive, defraud, and cover up, so that the receiver could not obtain possession of the "rents, issues, profits, and income."

III. Even if this be so, appellants say that King, nevertheless, was entitled to possession of the realty, and bound to receive the rents and income therefrom until the expiration of the redemption period, for the reason that Mrs. Linder, being unable physically, mentally, and financially to operate the place, had verbally assigned and turned over to her son the right "to possession and income therefrom" and the duty to care therefor. And accordingly, as consideration for this, he supported and cared for his mother, and put his own money into the financial deficits incident to such agricultural operations.

Next it is declared that King, having gone through bankruptcy, no longer owed the mortgage debts, and resultantly the "rents, issues, profits, and income" belonged to him exempt from the burden of the incumbrance. Said alleged assignment by the mother to the son is very indefinite and uncertain, and it is doubtful if it is specific enough to convey the crops for any particular year.

Anyway, the difficulty with this theory of bankruptcy is that both King and Mrs. Linder executed the mortgage contract which contains the pledge of the "rents, issues, profits, and income."

Appellant King was the pledgor, and this written compact was not dissolved by bankruptcy, except as it imposed a personal liability, as distinguished from the incumbrance or pledge. While the crops were growing, the application for receiver was filed July 24, 1925. Thereby, and at that time, the lien became effective on the "rents, issues, profits, and income," as provided by the "mortgage."

IV. The next complaint of appellants is that the 1925 crops were *fructus industriales,* and had been harvested and separated from the soil at the date of the decree, March 18, 1926. Therefore, it is urged that the chattels never became impressed with the mortgage lien. Error in this logic at once appears. Automatically, the lien becomes effective, not at the time the receiver is appointed, but rather, when application is made therefor, which

was July 24, 1925. *Kooistra v. Gibford*, 201 Iowa 275; *Rodgers v. Oliver*, 200 Iowa 869; *Hakes v. North*, supra; *Sheakley v. Mechler*, 199 Iowa 1390; *Whiteside v. Morris*, 197 Iowa 211; *First Nat. Bank v. Security Tr. & Sav. Bank*, 191 Iowa 842. *Kooistra v. Gibford*, supra, contains this precise statement:

"The commencement of the action and the request for the appointment of a receiver, and not the date on which the appointment is made, fix the time for determining questions of priority between the mortgagee and third parties claiming a right to the rents and profits or a lien thereon."

But it is said that *Hakes v. North*, supra, is authority for the pronouncement that the appointment of a receiver is not retroactive. What really was said in the *Hakes* case is that the selection and qualification of the receiver do not relate back to the date of the mortgage. In the *Kooistra* case this is explained, and it is made plain and emphatic that the "commencement of the action" is the pivotal point for the operation of the pledge clause.

V. Grievance of appellants is further based upon the thought that appellee Webber went to trial electing to rely upon the validity of the "lease," and sought to recover the "rents"  thereunder, and inconsistently, at a late hour, amended his hold by alleging fraud and the consequential nullity of the rental contract because thereof. Returning to the pleadings, it is found that this charge is not sustained. Originally no reference was made to the "lease." Later, in amendments, the appellee Webber alleges that he was "informed that appellant D. H. King had rented the mortgaged premises;" but the only relief there asked was an injunction, in order that the condition of affairs might be maintained *in statu quo*, so that all the parties could be finally and ultimately protected. It is material to note that, throughout the entire proceedings, Webber was also asking a restraining order against any disposition of the farm produce, and was insisting that Mitts, the tenant, had no right to the "premises" or the "crops." Finally, in an answer, appellee admitted the execution of the "notes" and the "lease," but again denied the right of Mitts to possession of the land thereunder.

Construing these various pleadings and their relation one

620

to the other, it is clear that there was no "election," and no inconsistent position taken.

VI.   Costs were taxed against appellants, and Mrs. Linder objects that this is erroneous, because the first and prior attempted appointment of receiver (the case at bar involves the  second attempt) was without proper notice, and therefore claimed to be void, and it was necessary for her to obtain dissolution of the illegal order.

Investigation of the facts concerning this shows that there was no contest on this issue, but that the order was set aside without trial thereon, and the items making up the total costs were incurred during the hearing on other and issuable points. Wherefore, appellants are not entitled to a retaxation.

VII.   By an attempted intervention, Mrs. John Bragg sought to obtain a modification of the judgment through special appearance.   She claimed 2,000 bushels of the corn involved in the receivership.

If Mrs. Bragg is not in court, as she insists, then truly there could be no adjudication against her, and she can still contest her title with the receiver in a proper proceeding therefor.   Appellee Webber concedes this, and argues that the so-called intervener did not properly come into the case, and was not in court.

VIII.   Ultimately, appellant Harriet C. Linder excepts to that part of the judgment against her involving unpaid interest  on the first mortgage, amounting to $5,427.20. Basis for this review is founded upon the lack of evidence showing that appellee Webber paid the same, and therefore he has laid no foundation for reimbursement.

Possible prejudice here lies in the fact that, if Webber has not paid this "interest," then, in the event of a foreclosure of the first mortgage, the holder thereof will also recover judgment for the same particular sum.   Explanation is lacking as to why recovery in this regard was permitted, and the record fails to substantiate it.

Hence, to this extent the judgment must be modified; otherwise, it is affirmed.—*Modified and affirmed.*

STEVENS, C. J., and EVANS, FAVILLE, and WAGNER, JJ., concur.