FIRST NATIONAL BANK OF IOWA CITY, Appellee, v. M. B. HART-
SOCK et al., Appellants.

CITIZENS SAVINGS & TRUST COMPANY OF IOWA CITY, Appellee, v.
M. B. HARTSOCK et al., Appellants.

**FRAUDULENT CONVEYANCES:** Confidential Relations—Parent and Child. A conveyance between parent and child generates no presumption of fraud, but necessarily invites critical examination of the attending circumstances. Circumstances indicative of fraud reviewed, and held to outweigh positive testimony tending to show good faith.

Headnote 1: 27 C. J. pp. 646, 828.

Headnote 1: 12 R. C. L. pp. 488, 588, 594.

*Appeal from Johnson District Court.*—R. G. POPHAM, Judge.

NOVEMBER 16, 1926.

Consolidated creditors' bills to set aside a conveyance of land by defendants M. B. Hartsock and Clara J. Hartsock to their son, defendant Ernest L. Hartsock. Decree for plaintiffs. Defendants appeal.—*Affirmed*.

*A. E. Maine,* for appellants.

*Dutcher & McClain* and *Byington & Rate,* for appellees.

MORLING, J.—The case presents only a fact question. The burden of proof is upon the plaintiffs. Fraud is not presumed. The relationship of parents and child between the grantors and the grantee does not create a presumption of fraud. It does require a critical examination of the attending circumstances. Fraud is not committed openly. It is an offense of secrecy. Direct evidence is rarely obtainable. Frequently it can be shown only by the circumstances admitted by the parties to it. Fraud may, and usually must, be proved by circumstantial evidence. The individual circumstances are usually inconclusive, and, attacked separately, may be blown away. The circumstances must ordinarily be considered together, and the force and weight to be given them are that of them in combination.

The circumstances of a bona-fide transaction are ordinarily consistent with each other, and with generally recognized business methods and fair dealing, and not incredible. A fraudulent transaction naturally begets stilted, contradictory, and incredible evidence. The bona-fide transaction and the fraudulent one each has its well recognized indicia. As said in *Jones v. McGruder,* 87 Va. 360 (12 S. E. 792, 798):

"A transaction may, of itself and by itself, furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendants, and even the evidence of witnesses. The circumstances attending and following a transaction are often of such a character as not to leave even a shadow of doubt as to the real object and motive of the parties engaged in it. * * * The motives and intentions of parties can only be judged of by their actions and the nature and character of the transaction in which they are engaged. These often furnish more conclusive evidence than the most direct testimony."

Though the parties concerned testify directly to the pay-

ment of valuable consideration and good faith, but the proved circumstances make such direct testimony improbable, and either alone, or with other evidence, leads the mind to the conclusion that the consideration claimed was not paid, or that the transaction, instead of being in good faith, was in reality fraudulent, the court should disregard the direct, and accept the circumstantial.

The conveyance attacked is of 110 acres, made September 14, 1923, and is claimed to have been made pursuant to agreement of sale, noted later. The farm had been owned and operated by M. B. Hartsock for a number of years, and was clear of incumbrance. M. B. Hartsock, before the conveyance, had signed notes of considerable amounts, as co-surety with one Hummer. Hummer, three days before the deed in controversy was made, had conveyed all his real estate to his two sons. The Hartsocks were expecting trouble on these obligations. The son, Ernest, the grantee, testified that he knew that his father's creditors might try to get the land. With this knowledge, the father, mother, and son went to a lawyer, and spent two hours with him. They went back home, talked the matter over, went to the lawyer's office again, and spent three hours there. Ernest testified, in auxiliary proceedings, that nothing was discussed except his father's making the deed to him, and his giving notes. The entire farm consisted of 150 acres, and was improved and occupied by the family as their home. The buildings were in the center. Forty acres surrounding the buildings, consisting of parts of two government forties, were not included in the conveyance. The 110 acres consisted of 10 acres east of the buildings, 40 acres south of the buildings, 10 acres west of the buildings, and 50 acres north of them. Ernest disclaims any knowledge of the homestead laws, and says that his parents, at the time of the agreement later referred to, told him that, whenever they got ready to sell the 40, he would have a chance to buy it. The price claimed to have been agreed upon for the 110 acres was $82.50 an acre. The plaintiffs' evidence tends to show that it was worth, in that form, $100 or $110 per acre; that the whole farm would be worth $25 to $35 more per acre. The defendants' claim is that the land was poor, and a brother of M. B. Hartsock's placed a value of $70 an acre upon it. If the plaintiffs' evidence on this subject is correct, the consideration was inadequate. The de-

fendants' description of the land and the value placed upon it make their claim that the son paid for it from its earnings with the rapidity which will be referred to later, even more improbable than if it were good land. The defendants' claim further is that Ernest was to have the use of the 40, and as compensation for that, was to "keep" his father, mother, sister, and two brothers. Their evidence is that the 40 was mostly pasture. Defendants claim that the father and mother wanted to keep the buildings for the 40 acres. Defendants testify that the father verbally sold the 110 acres to Ernest when he came of age, in January, 1917. Notwithstanding the character of the 40 acres, the father, after the alleged sale, spent $4,000 in building a barn, double corncrib, hog house, and chicken house on the 40. The defendants claim that the father sold to the son, not only the 110 acres, but all of his live stock and machinery. The mother, in auxiliary proceedings, testified that the sale of the personal property was some three years before Ernest became of age, and before the sale of the land. At the trial, all three testified that the personal property and the land were sold at the same time. They say that Ernest was to pay for the property as he made it from the land, $1,000 or $1,200 a year, if he could. If he could not pay that amount, he was to pay what he could. Ernest at that time had no property except a horse and buggy. Defendants testify that Ernest had previously announced that he was going to leave the home and try to buy a piece of land and equipment on his own account, as soon as he became of age; that his father and mother asked him to rent their farm, and he refused to do it, because he wanted to buy. He had not received any wages from his parents, and he testified:

"I was going to different parties I thought maybe I could see, and get some money and some help."

The defendants' claim is that the father was in ill health, and unable to operate the farm. Ernest went into the army on May 13, 1918, and came back August 8, 1919. It is admitted that, during his absence, the father looked after the farm, but it is claimed that Ernest authorized him to hire the help, pay the expenses, and credit Ernest with the net proceeds. Defendants testify that, during that period, the father took in from the land $4,500, from which he credited Ernest $3,000 on the purchase price, and paid him $200 cash. How much was expended for

hired help or how much work the father did is not shown.   Defendants claim that in 1917 Ernest paid to his father from the earnings of the farm, $1,550.   This notwithstanding the fact that not only the land was poor, but the cows which he purchased from his father had, as Ernest says, "got diseased," and he sold them, and replaced them with calves in the spring of 1918, to pay for which he borrowed $420 from his father.   In 1920, Ernest claims to have paid his father $3,254.64; in 1921, $1,225; in 1922, $1,142.28; in 1923, $906.97,—leaving a balance, at the time deed was made, of $1,097.25.   Ernest gave two notes at the time the deed was made, aggregating $1,087.25.   M. B. Hartsock was owing one of the banks that precise amount, and turned in the notes to that bank.

M. B. Hartsock did not keep a checking account in the bank, but kept his money on cashiers' checks and certificates of deposit.   The bank records of cashiers' checks and certificates of deposit show that, corresponding to the dates and amounts of the claimed payments made by Ernest to his father, so far as itemized, the bank issued cashiers' checks and certificates of deposit payable to the father.   There is evidence tending to show that Ernest, or his attorney, between the auxiliary proceedings and the trial, had a statement from the bank of such checks and certificates, from which defendants might have got the amounts which they claimed Ernest paid to his father.   Ernest kept a checking account.   After March 20, 1918, there were deposited to his checking account numerous items of the same dates and amounts as claimed payments to his father, but no corresponding checks against such deposits were drawn.   The inference, therefore, is that the proceeds of the farming operations were divided equally by Ernest with his father, one half deposited to the father, on certificates or cashiers' checks, and one half to Ernest's checking account.   The mother testified in the auxiliary proceedings that Ernest was renting the land on halves, though she said that it was for the three years before he became of age.   Witnesses testify to declarations by the father in 1922 and 1923 that the father owned the land, and Ernest was farming it on shares. We may say here that the appellants do not argue that the testimony taken in the auxiliary proceedings is inadmissible, and on the record are not in position to do so.   (The declarations of the father were not objected to.)   In this connection, defendants

introduced evidence of declarations by defendants that Ernest had purchased the land. One of the witnesses said at first that what the father said was that Ernest was running the farm. A sister testified that her mother wrote her, in January, 1922, "about how well Ernest was doing. She said he had the place about all paid for, and was talking of getting married," and that the sister wrote back:

"How are you all? We are fine. Where did you spend New Years? We were at home. It is pretty cold here now. Say I bet Ernest is glad he stayed at home now and took that land. He will soon have it paid for the way he works and saves. I am sure he couldn't have got a better start anywhere else. Well he surely has been a good kid and I think he deserves it if anyone ever did. Well will close."

No reference is made to the prospective marriage, though the sister says that this was the first information she had about it. The sister also testified to the sale transaction, though the mother's testimony on the auxiliary was that the sister was not present. Without taking space to go into the details, we may say that the record does not impress us that the letter was written at the time it is claimed to have been written. We may say in this connection that Ernest testified to having had a book account with his father, and that, when the deed was made, he destroyed the account. The testimony at the auxiliary was that there was no writing in existence, showing the dealings in question. At the trial, Ernest produced purported accounts of such dealings, on sheets of paper ostensibly contemporaneous with the transactions. The one for the year 1917 is headed, "What I bought of Dad when I started,"—an expression hardly compatible with the claim that it was an entry made at the time. It lists "land $9,075, 12 sows $240," and other items of personalty, all totaling $10,932. It proceeds: "Paid Dad $1,550, owe Dad $9,382." No items or dates of payment are given. The sheet for 1918 brings down this amount, adds an item of $420, "borrowed from Dad," and the item "amount owe Dad $9,803." For 1919, the statement is, "Dad got $3,000, borrowed from Dad $100," and various other amounts, totaling $363.14, which, added to the $9,803, makes $10,166.14. From this the $3,000 is deducted. Sheets for later years give items corresponding to the father's certificates of deposit account previously noted. We

are not impressed with the genuineness of these claimed accounts.

The defendants claim that Ernest was not to pay any interest, and that the father was to pay all the taxes. There were assessed to Ernest for 1918 one horse and one vehicle, and to the father, for 1918 and 1919, all of the farm and personal property. For 1920, the personal property was assessed to "Hartsock & Son." For 1921, there was assessed to Ernest "personal property consisting of one-half colt * * * one-half heifer, four cows, two one-half steers," etc., and to the father was the like assessment, and all of the land. Similar assessment was made in 1922. In 1923, the land was assessed to M. B. Hartsock, and the personal property to Ernest. The defendants' explanation is that the amount owed for the personal property was credited in full in 1922, and that the assessments were made to the father because the father was to pay the taxes, and had a lien.

The defendants' testimony is that, by the agreement in January, 1917, the total amount to be paid to the father was $10,932, and that the income of Ernest thenceforward was from the land. The deposits to Ernest's bank account, from none of which was payment made to the father, aggregate, according to appellees' computation (not disputed by appellants), $7,707.14. The addition of the payments claimed to have been made to the father makes more than $17,500, which, according to the defendants' evidence, Ernest must have realized as income from the property between January, 1917, and the time the deed was made, in September, 1923. During that time he was borrowing money of his father. Ernest now has all of the farm not exempt. His father has neither the non-exempt real estate nor the personal property nor their proceeds.

Without pursuing the subject further, we are of the opinion that the only conclusion that can be drawn from this record is that the conveyance was voluntary, except as to the $1,087.25, and that it was made with intent to defraud creditors, and voidable at their suit.

The judgment is—*Affirmed.*

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.