ROBERT L. LEACH, State Superintendent of Banking, et al., Appellants, v. J. G. EDGERTON et al., Appellees.

**FRAUDULENT CONVEYANCES:** Evidence—Connected Transactions.

1  Fraudulent transactions may be so related, connected, and interwoven that evidence thereof may be admissible against a party who was not present at the transaction.

**FRAUDULENT CONVEYANCES:** Active Participation in Fraud—Effect.

2  A fraud-participating grantee will not be permitted to hold the title because a portion of the consideration was bona-fide.

Headnote 1:   27 C. J. pp. 807, 808.  Headnote 2:   27 C. J. p. 545.

Headnote 2:   32 L. R. A. 36, 37; 12 R. C. L. 535.

*Appeal from Fremont District Court.*—T. C. WHITMORE, Judge.

DECEMBER 14, 1926.

REHEARING DENIED MARCH 22, 1927.

Suit to set aside conveyance of land as a fraud on creditors. Decree for defendants. Plaintiff appeals.—*Reversed.*

*Ben J. Gibson,* Attorney-general, and *Thornell, Thornell & Adams,* for appellants.

*Tinley, Mitchell, Ross & Mitchell* and *Hickman & Hoyne,* for appellees.

MORLING, J.—Under date of May 17, 1924, J. Glenn Edgerton (whom we will refer to as "Glenn") signed a deed to his mother, Victoria I. Edgerton Bell (formerly Estes, formerly Edgerton), for 160 acres of land in Fremont County. He gave the deed to the recorder the same day, and, after recording, it was sent to the grantee in Arkansas, where she was living. This suit is to cancel that conveyance, both for active and implied fraud. The status of the plaintiff as a creditor and the insolvency of Glenn are not questioned. The law of evidence in such cases is discussed in *First Nat. Bank v. Hartsock,* 202 Iowa 603. Only fact questions need be considered.

The consideration claimed consists of a promissory note, bearing date July 15, 1916, for $4,850.50, three notes aggregating $18,000 (two for $5,000 each and one for $8,000), bearing date January 5, 1922, and a fifth note, dated March 1, 1923, for $1,000, all signed by Glenn and all payable to the mother. The *bona fides* of the last mentioned note for $1,000 is not questioned.

That the note for $4,850.50 is a fabrication we think is not open to serious controversy. This note and the two $5,000 notes and the $8,000 note are on the blank form of the Atlas Bank of Neligh, Nebraska. They all have the printed date line of "Neligh, Neb................192...." In the $4,850.50 note there is inserted in the date line between "Neligh, Neb.," and "192...," the date "July 15, 1916." It will be observed, therefore, that this note, though ostensibly dated July 15, 1916, is written on a blank form that was printed for the next (1920) decade, beginning nearly three and one-half years after the purported date. The mother testified that it was given at the time it was dated. There is no evidence that this bank in 1916 had forms of notes printed for execution in 1920 and later years.

The defendants testified that all four of these notes (though not on the same occasion) were drawn by the payee's brother, one Payne, who lived at Neligh, Nebraska. Payne was not a witness. The father of Glenn Edgerton died May 14, 1916. Payne was appointed administrator. Glenn testified, when first called, that the note was for a book account that he owed his mother.

"We were in the cattle and hog business together. I gave the note to Mr. Payne, as he was administrator of the estate."

He says that the note was made by Payne at Neligh, and sent to him (Glenn) for signature. When called at the close of the case, Glenn testified that:

"The bulk of the note * *. * was given for my buying a half interest in the stock with my father, and there were some little debts with him after that."

The mother's testimony is that Glenn owed the estate $4,850.50, and that:

"It was taken off of a book that Glenn had always kept their business in,—the business between him and his father."

She testified that the book was burned; also that all the letters relating to the matters in controversy, which must have been numerous, were burned. The mother testified that she and Glenn and Payne were in Hamburg when the note was executed, but that she does not know how it came to be dated at Neligh, Nebraska; that Payne may have made the note out and brought it with him; that it was made out in July, 1916, but she doesn't know when she got it; that it was after the estate was settled. In the estate proceedings, Payne inventoried an undivided half interest in 203 hogs and pigs, two cows and two calves, stating the other half to be owned by Glenn. There is no evidence tending to show that these hogs, pigs, two cows, and two calves were any different from the ordinary farmer's summer stock of hogs and pigs. That such half interest would not be worth more than a fraction of $4,850 may be inferred from the report later referred to. The inventory was dated May 26, 1916. It lists also cash in bank, a note given by a third party, and an interest in hogs in Colorado, of which the other interest was owned by Paul Edgerton. The inventory lists no account as owed by Glenn. The only report is the final one, which contains the items January 12, 1917, profits on glen (Glenn?) cattle $584.85; February 24, 1917, proceeds on hogs $600; April 4,

1917, proceeds on hogs $83.37. The report shows sale also of corn and oats, the total collections amounting to $1,556.72. It shows payments made by the administrator to a larger amount, and says that the administrator has paid the heirs their proportionate share of the personal property, and they have reimbursed him for the excess paid out by him. The mother testified that she talked with her other son, Charlie, about what Glenn owed the estate; that Charlie understood it. Charlie and his wife both testified that they knew nothing about Glenn's owing the estate. The note is not payable to the administrator. It nowhere appears as belonging to the estate. This note, if in existence, and genuine, was due in July, 1921. In October, 1921, the mother (as is about to be related) came to Hamburg, to get Glenn to take her Colorado land, in order that she might pay her debts. If Glenn owed the $4,850.50 note, there was due on it over $6,000; but no one claims that any reference to such a note was made in the transaction about the land, or that the mother tried to get her debts paid out of that. On the contrary, Glenn in the land deal admittedly borrowed of the bank a large sum with which to pay her debts, and was given no credit on the note; and the amount admittedly paid by Glenn on his mother's debts was, as will be seen, in excess of the claimed price of the land. Without further comment, it is sufficient to say that the evidence is convincing that the alleged debt never had any existence.

The consideration for the three notes aggregating $18,000 is claimed to be the purchase price of 480 acres of Colorado land sold by the mother in the course of a transaction beginning in October, 1921. The mother had married Estes, and was living in Arkansas.

The 480 acres had been sold in 1919 to Barnes for $30,000. Barnes was to assume a $12,000 mortgage and pay $18,000, according to the terms of a trust deed and notes. The trust deed and notes, however, according to Glenn, were never delivered to his mother, "for the reason that the deal was not completed." Interest, taxes, and water rent were delinquent. The mother testified that, in October, 1921, she came from Arkansas to Fremont County, and told the two boys, Charlie and Glenn, that:

"I come to deed over my 480 acres of land to them, share

and share alike, if they could handle it. They were to pay all my indebtedness, and give me their notes for $9,000 apiece. ..I says, 'You give me your notes for. $9,000 apiece, under the same contract that the Barnes deal was made.' ''

Charlie was in debt, and he wanted 200 acres that Glenn had in Colorado, so that he could turn it in on what he owed. The mother testified that she then said to Glenn:

·· ''Well, now, you could fix it this way. I want to do the right thing by both of you boys. I will make a deed to you for 240 acres, and one to Charlie for 240 acres; and then, if Charlie wants your 200 acres, you and Charlie get together and make · your deal. * * * If you go ahead and make this deal, * * * I will make you a deed then to the 480 acres under the same contract I have with Barnes.''

She also says that she told Charlie and wife that Estes wanted her to do that; that he had property enough; that he said:

'' 'To take the worry off of you.'. He did not want to take care of the 480 acres; he didn't want the worry of it.'' .

It will be noted that the mother and her then husband were evidently worrying about the Colorado land. Charlie's wife testified that what the mother said was that she would deed the 480 acres to Charlie and Glenn if they would assume her indebtedness; that the mother said she wanted her indebtedness paid, and that Mr. Estes said he ''did not want the land * * * didn't care to be bothered with the 480 acres of land, and that she came back, as she wanted her indebtedness to the Farmers Savings Bank paid. She came back to have that taken care of.'' Charlie's wife says that there was never at any time anything. said about any $9,000 that Glenn was to give his mother, or. that Charlie was to give his mother for the purchase of the 480 acres. Charlie gives the same testimony. The mother went back to Arkansas. The brothers went to the bank and made a deal by which Charlie got Glenn's 200 acres and Glenn took the 480 acres. A memorandum of this arrangement was made in the bank at the time. By it, according to the undisputed evidence, the price of the 480 acres was figured on the basis of the amount owed on the Barnes contract, including taxes, $20,246.40,—the mother's debts amounting to $3,628.25. The deduction of this and another small item from the price of the land left the

amount to be paid by each of the sons for 240 acres (one half of the 480) $8,290.32. The land that Glenn turned to Charlie was put in at $5,534.70, so that the amount left that Glenn owed Charlie was $2,755.62. Glenn made settlement accordingly, and paid his mother's debts, and in doing so borrowed money of the bank. It is undisputed that nothing was then said to the effect that Charlie or Glenn should pay, or give their mother notes for, $9,000 each, or $18,000. The deeds were prepared in the bank. Glenn's reason (in testimony) for not then having the notes made out was that his mother, when she was there in October, told him that she wanted Payne to make them out. Of the three notes signed by Glenn, $5,000 was due March 1, 1924, $5,000 March 1, 1929, and $5,000 March 1, 1934, the same as the Barnes notes. The $18,000, plus the mortgage of $12,000 and the payment of the mother's debts, amounting to $3,628.25, would make the purchase price more than the amount which Glenn and his mother claim they were to pay for the land. Glenn testified that, though Barnes was to pay $62.50 per acre for the land, it was worth $100 per acre. This does not enhance his credibility.

Objection is made that evidence of the transaction between Glenn and Charlie at the bank, at which the mother was not present, she having returned to Arkansas, is not admissible against her. The mother testified, however, that she told Glenn and Charlie to make the deal between themselves, to carry out her alleged deal with them. Glenn and Charlie went to the bank for that purpose. The transactions are so connected that evidence of what occurred in the bank, especially in such a case as we have here, is admissible. *Sutton v. Kelliher,* 115 Iowa 632; *Eames v. Kaiser,* 142 U. S. 488; *Sonnentheil v. Texas Guaranty & Tr. Co.,* 10 Tex. Civ. App. 274 (30 S. W. 945).

1. FRAUDULENT CONVEYANCES: evidence; connected transactions.

The $1,000 note went through the Hamburg bank, and is on its form. Numerous other circumstances not necessary to detail re-enforce the inference of fraud. We are convinced that the alleged indebtedness of $18,000 founded on the three notes is also spurious. The bank was pressing Glenn for payment of his notes. He wrote to the bank, December 29, 1923, that he was trying to dispose of the Colorado land and thereby reduce the debt. He took the deed to the recorder, and asked her to

2. FRAUDULENT CONVEYANCES: active participation in fraud: effect.

send it to his mother. He made a financial statement, which showed no such debts as he now claims to owe his mother. This was admissible, at least as affecting his credibility and as bearing on his intent. That the deed was a fraud upon the bank, and that his mother actively participated in the fraud, we think is not to be doubted. Under these circumstances, the mother is not entitled to retain the title for the payment of the $1,000 bona-fide indebtedness. The court below should have decreed the deed to be void as to plaintiff.

The judgment is—*Reversed.*

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.

STEVENS, J., took no part in the consideration or decision of this case.