Otis C. Dimick, Appellee, v. Myron T. Munsinger et al., Appellants.

January 15, 1929.

*C. E. Dean* and *Genung & Genung,* for appellants.

*William E. Shuman* and *Tinley, Mitchell, Ross & Mitchell,* for appellee.

Morling, J.—Defendants Myron T. and Minnie M. Munsinger moved from southwestern Iowa to Wayne County, in eastern Nebraska, in 1907. They there bought a farm for $20,000, paying $10,000 in cash, of which they claim $3,600 was the money of the defendant Minnie. In 1919 they made a sale of this farm, by which they were to get, by March 1, 1920, $54,000 in cash, above the incumbrance. It is their claim that, about March 1, 1920, they had a settlement with each other, by

which it was agreed that, as Mrs. Munsinger had furnished one third or more of the money used in the purchase of the eastern Nebraska land, she should have one third of the $54,000. She says:

"He wanted to advance the money in lands he was buying, and I said it was all right with me if he gave me notes. At that time he executed and delivered to me a series of notes, amounting in the total to $18,000."

The note for $4,500, dated March 2, 1920, later referred to, is claimed by defendants to be one of these notes. What became of the others is not shown, further than will appear later.

In 1919, besides selling the land in eastern Nebraska, defendant Myron embarked in heavy real-estate-buying operations in northwestern Nebraska. The details of these operations need not be stated. It appears from his testimony that he bought 640 acres for the price of $44,000; two 160-acre tracts and one 320-acre tract (640 acres) for $85 per acre; one 160-acre tract for $87 per acre; one 160 acres for $100 per acre. He obtained an assignment of a contract to purchase 955 acres, the purchase price of which was $164,000. In some instances, the crops went with the land. Settlements seem to have been made on March 1, 1920, and, of course, involved the giving and assumption of many and large mortgages. Also, in the fall of 1919, Myron purchased a home in North Platte, Nebraska, the price of which was $7,500. That Myron had means other than the $54,000 is not shown. On March 4, 1920, defendants Myron and Minnie gave to the vendor of one of these purchased farms a chattel mortgage for $3,000 on wheat. In August, 1920, defendant Myron gave three chattel mortgages on and for farm machinery, the purchase price of which is the indebtedness for which the judgment sued on (upwards of $10,000) was procured. From March, 1921, forward to February, 1924 (mostly in 1921), defendant Myron gave about 25 other chattel mortgages and bills of sale on crops, machinery, wagons, saddle, tanks, fencing, and feed bunks, ranging in amounts from $75 to $15,000. One of these was a bill of sale to defendant wife, dated June 16, 1923, on "all crops and hay" (on what land not shown), for $4,276.25. On October 8, 1919, an action by one of the vendors was brought against defendant Myron on promissory note. It was dismissed

September 27, 1920. On June 11, 1920, an action was brought against defendant Myron for legal services. This was compromised and judgment satisfied August 6, 1920. On November 24, 1920, an action on promissory note was brought, and later dismissed. From March, 1921, forward, many actions on promissory notes, for goods sold, for wages, for legal services, and for foreclosure of chattel and real estate mortgages, were brought. Some were settled. In many, judgments were rendered. Some of the judgments were settled, executions were issued (some returned unsatisfied), mortgaged premises were sold. That the "boom period" did not survive the settlement date, March 1, 1920, and that there was a decline in values, appears from the evidence.

It is alleged by plaintiff, and admitted by defendant, that, "on and prior to March 17, 1922, the defendant Myron T. Munsinger was the owner of an undivided one-half interest" in the 200 acres in Mills County in controversy. We know nothing concerning the ownership of the other half interest. The entire tract was of the value of $29,000, and subject to three mortgages aggregating $13,000. Myron's interest seems to have come to him by inheritance, November 15, 1921. Armiva V. Blake, a sister of Myron's, appears to have had some sort of an unsettled interest in Myron's half. On March 13, 1922, defendants Myron and Minnie executed a deed (one of the two here under attack), by which, "in consideration of love and affection and the sum of one dollar," they conveyed to Armiva V. Blake "the life use of the lands hereinafter described. At the death of the said Armiva V. Blake, the life use of the lands hereinafter described, to revert to grantors; and subject to the above named life estate, we do sell and convey unto Joseph M. Munsinger of Lincoln County, state of Nebraska, the following described real estate * * * " (describing the 200 acres).

It will be noticed that this deed is in consideration of love and affection and one dollar; that Myron had only a one-half interest; that Mrs. Blake, whose health, as defendant Minnie testifies, was "first rate," was given a life estate. (From her testimony in another court action, it may be inferred that Mrs. Blake was in bad health.) Defendant Minnie's testimony is that: "At the time the deed was signed, Mrs. Blake was receiv-

ing the rents and profits of this land." Mrs. Blake died in the fall of 1922.

"As long as she lived, she paid the taxes, bills, and managed everything, as long as she lived. There was no change made in the handling of the property upon the execution of this deed to Mrs. Blake."

It will be noticed further that not only to the judgment debtor, the defendant Myron, but to his wife, the defendant Minnie, the life use reverted after the death of Mrs. Blake. The deed was made subject to the three mortgages aggregating $13,000. No consideration by the defendant Minnie for her life use, unless it is her relinquishment of dower, appears. The deed, therefore, left in defendant Myron, after Mrs. Blake's death, only a life use, concurrent with the life use to his wife, in an undivided one half of 200 acres, subject to $13,000 of incumbrance. The consideration set up in behalf of the son, defendant Joseph, is this: Joseph was born November 7, 1896, so that in 1916 he was approaching his twentieth birthday. In the summer or fall of 1916, according to the testimony of defendant Minnie:

"Joe said he wanted to do something for himself, and his father said he didn't want him to go away from home. We had land there [Wayne County, Nebraska], to farm, and Mr. Munsinger himself wasn't able to farm. Mr. Munsinger's health wasn't good, and he said he would be glad to have Joe take over the farming and handle it, and would give him an interest in it. Joe said he would do it for one-half interest in the stock, proceeds of the hay and corn raised on the farm. And Joe started to work under that arrangement in the year 1917 or in the fall of 1916. * * * We had 110 acres of alfalfa on that 160 acres, and we had about 40 acres of corn, and raised a good many hogs and quite a few sows. Joe continued to work that way until he went away to the army, in 1918. He enlisted on the 29th or 30th of May, 1918. * * * He was married in January before he went to war. They lived in the same house with us. Joe and Mr. Munsinger raised on the place in 1917 about 130 or 140 head of hogs that was sold in the year 1918, * * * before Joe went to the war, and then we had some sows in that batch. The hogs sold for $2,400. I don't think Joe received his share of the proceeds from the hogs before he went to the army. After the sale of

those hogs, there was about 20 sows left, when they sold the fat hogs, and they had some spring pigs from those sows that spring. They had quite a lot of alfalfa * * * I know how much alfalfa hay there was sold during the year 1917 and 1918. There was a little more than $5,500 worth. I kept a record of those sales."

She produced the record, totaling $5,799.99. This record is not before us, but it seems to have been a record of hay shipments, entered from the waybills. Defendant Minnie was asked:

"Q. On the top it says, 'our own hay.' A. I wrote that there to specify that that wasn't hay bought; I mean that was hay produced on our own farm at home."

Joseph went to the army the last of May, 1918, and returned in March, 1919. Defendant Minnie testifies:

"Joe said he wanted to go to the war, and what would he do? He hated to go away and leave the farming. His father told him to go ahead, if he wanted to go, and he could have and hold his interest in the farm, just as he had done before."

The testimony of defendant Joseph is:

"The crop of hay for 1917 brought seven thousand eight hundred and some dollars. My half interest was around $3,900." Also: "Those hogs brought $2,400, and my half of them was $1,200. * * * The value of the brood sows and pigs that was left there was around $500,—that is, my half."

According to his evidence, Joseph in 1917 got a car, costing "around $485. That money didn't come out of the income from the place. It came out of money in my pocket. * * * I haven't computed what the percentage of the hogs was expense. What I have given was the net proceeds. I never computed what portion of the money from the sale of alfalfa was used as expense. I took care of the alfalfa practically all myself. I had to hire help. I had all of my own machinery. I owned the bailer and thresher."

Where he got the money for all of these operations and purchases is not shown. He had previously testified that, in the fall of 1916:

"I suggested to my father that I would like to get to farm-

ing for myself, and he said he would help me get a start. * * * I would rather do that than leave home, and we did that. I began under that arrangement on the first of March, 1917.''

He also says:

''I had no use for the money while in the army, and I turned it to him [father] when I left, to use it in his operations and business. I also permitted him to have the money I collected for the wheat in Cheyenne County, Nebraska.''

A witness formerly living near defendants in eastern Nebraska testifies: ''During the years 1917, 1918, and 1919, before the Munsingers left there, Mr. Munsinger and Joseph Munsinger were partners in the operation of the farm.'' He says he got that understanding ''from both of them.'' When he got it, is not disclosed. Counsel argue that this acquisition of wealth by Joseph during the 15 months from the time his father was to give him the start, during most of which he was still a minor, is not incredible, because times were so good. We can hardly take judicial notice that those good times were sufficiently prosperous to account for the remarkably swift financial attainments of this young man, as thus testified to.

But Joseph's prosperity did not terminate with his enlistment and leaving home, or with the good times. It would seem from defendants' evidence that the father was also owing Joseph for some corn raised in 1918, which we do not find explained. In the fall of 1920, according to defendants' evidence, Joseph put in some wheat on one of the half sections acquired by the father in northwestern Nebraska. Defendant Minnie testifies:

''I have a record of that. [The witness here produced the record.] I heard a conversation between my husband, Myron T. Munsinger, and my son, Joseph Munsinger, relative to putting in that crop of wheat. He told Joe, if he would put that wheat crop on that half section, he could have one half of it. Put it in and harvest it, of course. * * * I kept a record of the crop of wheat. * * * I was there on this half section of land at the time the wheat was being delivered, and saw the trucks there hauling the wheat; and as soon as the men came back with the tickets, they delivered them to me. * * * Joe Munsinger put that wheat in. He did the threshing, and Morris and another

man hauled it to the elevator. I knew the fair, reasonable market value. * * * It was worth 92 cents a bushel. Q. And then his one-third interest in this wheat crop that has been referred to by Mr. Moore and others? A. One-half interest. Mr. Moore got his one third out of our half. We traded that to Mr. Moore after it was seeded, and we contracted he was to have one half; and then, after he [Joseph—explained later] said he didn't want that 320 acres, we traded that to Mr. Moore, and we got his one third out of what would be our half. We didn't have very much left.''

Defendant Joseph, after relating this arrangement, saying that it was in 1921, testifies:

''My own interest amounted to $1,452,—approximately 3,000 bushels, before it was divided, or a little better. I had a one-half interest in it. My father received the money, and I never got it.''

Speaking with reference to 1921, when he put in this wheat crop in Cheyenne County, Joseph testifies:

''I had a checking account of money right along, all this time. * * * in the First National Bank of Wayne, American State Bank at Sidney, and in the First National Bank at North Platte. I received none of the receipts from the hogs, alfalfa, and wheat.''

Where he got this money is not shown; for, as will appear, though in 1920 and 1921 he was working for his father, his father did not pay him. Joseph testifies:

''I worked for my father in 1920 and 1921 at Sidney, Nebraska, operating a threshing machine. I ran 64 days in 1920 and 50 days in 1921, at $10 a day, or $1,140; but I did not receive any pay. * * * Besides the engine work in 1920 and 1921, I worked for my father. * * * He told me he would pay me $50 a month, and I told him that was agreeable with me; and, after deducting what he paid me for the year's work, it was $300 due me. * * * I had a conversation with my father in 1921 about my taking the land in Cheyenne County in payment of what my father owed me. * * * He said, 'I would like to have you take this property, son, for what I owe you, and you can finish

paying out the balance;' and I told him, 'No.' I would want to live out there first, before I would take on any proposition like that. * * * She [Joseph's wife] did not like it at all, and neither did I * * * The first talk I had with my father after he came into possession of the Iowa land [in controversy] was in 1921, * * * I suggested that he deed me this land that he had coming into possession of, in consideration for what he owed me, subject to the life estate of my father and mother, and also subject to $13,000 mortgage, in consideration for that which he owed me, of $9,210. * * * My father said he would do it. * * * In accepting the deed, it was to liquidate all of the indebtedness my father at that time owed me.''

It will be noticed that this talk is alleged to have taken place at the time this harassed debtor ''came into possession'' of the land in question: that is, when by the death of the brother it was inherited. One of the reasons given for not taking the western Nebraska land and for taking the Iowa land was that Joseph and his wife did not want to live in Nebraska. Minnie testifies:

''Joe said he would like to go to Iowa and live, and suggested that Mr. Munsinger deed him enough land to pay what he owed him; and Mr. Munsinger became heir to some land in Mills County, through the death of his brother, Warren * * * ''

The Iowa land was taken subject to the reservation of its use for three lives, and the express consideration of the deed was love and affection and one dollar. It was worth $29,000, subject to $13,000, leaving a one-half equity worth $8,000, subject to three life estates, which, according to this evidence, Joseph took as ''enough land to pay'' $9,210. Joseph further testifies:

''In March, 1922, I did not know anything about what father owed other people. I did not know, in March, 1922, that he owed Mr. Dimick anything. I knew that he bought an engine and threshing outfit. I operated the engine, but my father never said a word about it, how he bought it, whether he paid cash for it, or anything about it. And when I accepted the deed in payment of what my father owed me, I had no intent to wrong or defraud anybody.''

There is in the record the testimony of defendant Joseph

in some other proceeding, to the effect that, in the summer of 1921, he was operating a threshing engine when the plaintiff and Wills and the father had a conversation. Joseph says that Wills says:

" 'Throw off the belt; stop her here, right now.' And so I shut her down, and got out, and they chewed the rag around there, and finally Mr. Wills said: 'Well, if you want to go on, come up and give us an order for threshing bills, and we will let you continue to operate.' My father didn't like to do that; he was pretty mad because they bothered him right at noon; but we finally consented, and they went to the house, and the separator man provided a list of the men we threshed for, and my father signed an order; and they said, if he would sign the order, they would let us operate until next fall, 1922; so my father gave him the order to collect the bills, and they were satisfied, and went away."

Under date of June 24, 1924, defendant Myron signed a deed (the second one here attacked) to defendant Minnie to all his interest in the land in question, for the recited consideration of $3,480.

Before setting out defendants' explanation of this consideration, it will be well to revert to conveyance of the home property in North Platte by defendant Myron to his wife, defendant Minnie, made October, 1919, for $7,500, subject to a mortgage of $5,000, due in monthly payments to the Building & Loan Association. Defendants claim that the consideration for the deed from her husband to her of this home was the husband's note to her of $4,500, dated March 2, 1920, one of the series of $18,000 above referred to. The note was marked "paid" October 16, 1923. What became of the other notes of this series is not shown, further than that it appears inferentially from the record that the bill of sale to the wife in northwestern Nebraska was based upon one or more of them.

Defendant Myron testifies that, just previous to October 16, 1923, he had a conversation with his wife, in which "she said she wanted some security for what I owed her; and I told her I was willing to make a deed to her for whatever the equity was in the place" (North Platte homestead), and that, in pursuance of that conversation, he executed the deed to her of the home-

stead, and received back the note. None of the defendants testified to the mention of any other indebtedness at that time, or of any other property, or giving any other credit.

The wife's account of the consideration for the deed subsequently made to her of the husband's remaining interest in the land here in controversy is that she had his note for $3,000, on which there was $480 interest due, on which $120 had been paid October 15, 1922, and indorsed, and that she gave him this note in consideration of the deed. She says: "The consideration for that note I gave him * * * $1,000 at one time and $2,000 at another time. He used it and gave me his note in return." The note, she says, was dated November 15, 1921, and, of course, if in existence, was held by her when she was, as defendant claims, asking for security, in October, 1923, "for what I owed her;" but it is not claimed that any mention of this note was made then, or at any other time, in connection with demand for security or payment. Another explanation given by defendant wife is as follows: She says Exhibit 8 is a promissory note dated March 2, 1920, for $4,500, given by M. T. Munsinger to Minnie, marked "paid" October 16, 1923. Exhibit 10 is a note dated December (November?) 15, 1921, for $3,000, made to Minnie M. Munsinger, marked "paid" June 24, 1924. She testifies:

"Referring to the two notes marked Exhibits 8 and 10, I will say that Exhibit 2 (?) was a part of the settlement with my husband for the interest in the Wayne County land, dated the 15th day of November, 1921. It is a renewal of a note given earlier, a note of the same amount. The suit Mr. Shuman asked about me, making some claim in replevin, was in Cheyenne County. None of these notes in this case were ever used in that case. It was none of these notes; it was another separate note. That note was introduced into evidence up there. I have the note that was used in evidence up there. The note that the reporter has marked Exhibit 21, being a note dated August 1st, 1921, for $4,376.25, * * * was a note that was used in the case in Nebraska."

Among the actions brought in Nebraska appears one in replevin by defendant Minnie against a sheriff in 1924, to recover possession of corn. Exhibit 21 does not appear further in the abstract.

It will be noticed that November 15, 1921, is the date of Myron's inheritance of the land in question, and that it is the date given in the testimony of the $3,000 note.

Plaintiff brought action in the Mills County, Iowa, court, to recover on the Nebraska judgment. It was commenced by the service of original notice on June 13, 1924. The deed was made in the office of the defendants' attorney on June 24, 1924, apparently a day or so before default day. As has been seen, the one-half interest of defendant Myron in the 200 acres in controversy had (on defendants' contention) been reduced to a concurrent life estate with his wife, subject to $13,000 incumbrance. He, at the time of the trial, was 63 years old, and, according to the evidence, had been in bad health. For this interest the wife claims to have paid, as has been seen, $3,480 by the surrender of what she claims was a good-faith debt, and owed by the husband, who, she claims, was not insolvent, and had no purpose of defrauding creditors.

Defendants have introduced evidence of the value of lands in northwestern Nebraska, to prove that defendant Myron was not insolvent. Defendants contend particularly that defendant had $50,000 interest in the 955-acre ranch for which he had the assignment of the contract which has been referred to. Strict foreclosure of this contract had been effected, in the course of which an agreement was made, February 1, 1924, reciting that there was unpaid on the original purchase price, with interest, $116,325 and $14,866.07, besides taxes, $3,524.95 and $2,373.20. A question to defendant Minnie, on cross-examination, urged that there was $180,000 against this tract, to which she replied, "I don't know." That values were declining is, of course, admitted by all value witnesses. Testimony to theoretical values of lands in such a period of stagnation, depression, and admitted decline, and in the face of overwhelming defaulted indebtedness, judgments, and foreclosures,—conditions obvious to these grantees, as well as to others,—is wholly devoid of substance. No other rational inference can be drawn from this record than that defendant Myron was hopelessly insolvent, and known by his wife and son to be so. That his aim was to ostensibly dispose of his property while retaining its beneficial use is clear, not only from the deed to Joseph, relied upon, the deed of the home to his wife, the relinquishment of his reserved concurrent life

use to his wife, but also from deeds made to two other children.

On October 16, 1923, defendants Myron and Minnie conveyed to their son Charles half of a section of land, and to their daughter Elta the other half, each deed reciting a consideration of $1.00. Defendants' explanation of the deeds is that they made the deeds because they were told that they "could get a loan better with two owners. We did not secure a loan right away, but if we didn't, we helped the other fellows to get it. That is, they got the land by foreclosure and sheriff's sale, and we were trying to get a loan so we could redeem it before the land went to sheriff's deed. * * * We were unable to get enough at that time to pay off the mortgage foreclosure decree. The deed to my daughter Elta was for love, affection, and one dollar. The one dollar was actually paid. * * * the other deed was executed to our son, Charles Morris Munsinger, and the consideration was the same." The deeds, however, were made "subject to a life lease which the said grantors claim for the rest of their natural lives, said grantee to come into full possession of said lands after the death of said grantors. To have and to hold * * * unto the said Myron T. Munsinger and Minnie Munsinger his wife and to their heirs and assigns forever." The execution of deeds with such reservations by one who was so "land poor" and utterly insolvent, to his children, would be likely to increase, rather than dimish, the difficulty of getting new loans. The evident purpose in these deeds was to save to the grantors the benefit, while executing ostensible transfers of the ownership of the lands.

Defendant wife testifies that she did not know that, during 1921 and the first part of 1922, "numerous creditors were filing suits against my husband. The sheriff at times brought notices to my home, but I don't think it was in 1921 and 1922. Some of these notices were pushed under the door, in the absence of both of us. I didn't think he had creditors whom he wasn't able to pay at that time." She testifies to her personal knowledge, however, of numerous business transactions, to her overhearing them, and to her knowledge of the properties and their values; that she was the bookkeeper of the family. That she did not know her husband's financial condition, of his notes, mortgages, and the actions against him, is incredible. The defendants' argument with respect to Joseph is: "We challenge the record to

show that Joseph M. Munsinger or Armiva V. Blake had any knowledge of the grantor's exact financial condition." It may be said quite plausibly that this insolvent did not himself know his "exact financial condition." The intimate family relationship of the defendants, the knowledge which the wife and son claim with respect to the husband's and father's financial affairs, which were to their interest, the incredibility of the arrangements which they claim were made, their participation in the reservation of interests to the insolvent, the testimony of the son in the other action referred to, preclude the acceptance of the son's and wife's denials of knowledge of insolvency and of the pressure of creditors. Purpose to defraud creditors and knowledge and participation of grantees therein are not proclaimed from the housetops, and ordinarily are susceptible of proof only by circumstantial evidence.

The evidence establishes: (1) Intimate family relationship of the parties, calling for close scrutiny of the transactions and of the evidence offered to show consideration. (2) Hopeless insolvency of the grantor. (3) Heavy, persistent, and notorious pressure of creditors, through legal process and otherwise, for enforcement and satisfaction of their demands. (4) Efforts of the insolvent to retain to himself the beneficial use during his life of properties he was conveying. (5) Transfer to the wife in anticipation of judgment against grantor in action then pending. (6) The transfers assailed are of the only property in which the debtor had left any valuable interest. (7) The claimed arrangements resulting in the alleged consideration and motive for the conveyances are not in accordance with ordinary course of business and business methods, and are incredible. (8) Contradiction between named consideration in the first deed and present explanations, and contradictions in the explanation of the consideration of the last deed. (9) Overdoing of the attempted explanations of consideration. (10) Knowledge and participation of grantees in grantors' purpose to make ostensible conveyances, while reserving beneficial interest.

The law applicable to such cases has had our attention in so many recent decisions that more than the citations would be superfluous. *Coburn v. Davis*, 206 Iowa 649; *Webber v. King*, 205 Iowa 612; *Tirrill v. Miller*, 206 Iowa 426; *Aldrich v. Van Hemert*, 205 Iowa 460; *Cover v. Wyland*, 205 Iowa 915; *Leach*

*v. Edgerton,* 203 Iowa 512; *First Nat. Bank v. Hartsock,* 202 Iowa 603; *Corn Belt Sav. Bank v. Burnett,* 203 Iowa 271; *Hogeboom v. Milliman,* 202 Iowa 817; *Botna Valley State Bank v. Greig,* 190 Iowa 155; *Jordan v. Sharp,* 204 Iowa 11; *Barks v. Kleyne,* 201 Iowa 308.

That the conveyances attacked were voidable at the suit of the existing creditors for both actual and implied fraud we think is obvious.—*Affirmed.*

ALBERT, C. J., and FAVILLE, DE GRAFF, and WAGNER, JJ., concur.