CLEMENTINA RANSOM, Executrix, Appellee, v. GEORGE F.
LOCHMILLER et al., Appellants.
No. 38184.

APRIL 2, 1929.

R. Shaw Van, J. E. Shaw Van, and Salinger, Reynolds &
Myers, for appellants.

W. E. Kahler and L. W. Powers, for appellee.

MORLING, J.—The stated consideration in the bill of sale is
one dollar, and that in the deed is shown by the evidence to have

been nominal. Though not so stated in the abstract, it is stated in the court's findings, asserted by plaintiff, and not denied by defendants, to have been ''one dollar and love and affection.'' These instruments, executed by two of the defendants and accepted by the other, are an admission by all of them, and prima-facie evidence, that the consideration for the alleged transfers other than that of love and affection was nominal. The evidence is that the real property itself is worth $2,500. The undisputed evidence is that the grantors were then insolvent. It was for the defendants, therefore (as they did), to go on with the evidence. The conveyances were to the daughter of the grantors, and the evidence of consideration and good faith should be closely scrutinized. The trial court held that defendants' testimony offered to show a valuable consideration was incredible, and rejected it. Appellants' propositions here are that the court was not warranted in rejecting such evidence; that it was uncontradicted, and should have been accepted as true. Appellant urges that her parents are thereby shown to have been indebted to her, and had the right to prefer her to their other creditors.

Defendants' evidence consisted of their oral testimony and the testimony or professional statement of their attorney.

First, with respect to defendants' motives and interest. Defendant George had purchased of his mother a farm, on account of which the indebtedness in question of George and Nettie to the mother's estate was incurred. The mother's estate consisted of what was owed to it by George and of $5,000 owed by a brother and $500 owed by plaintiff. It is a reasonable inference that George expected that his share in the mother's estate would materially reduce, if not pay, his debt. The mother, however, willed to George and to three other children only nominal amounts, and willed the residue to plaintiff. George unsuccessfully contested the will. His expectation and desire with respect to payment of his indebtedness by means of his share in the estate were, therefore, disappointed. He is on unfriendly terms with plaintiff and her husband.

As has been said, the grantors, George and Nettie, at the time of the conveyances to the daughter were insolvent. Defendants say that it was part of the arrangement with the daughter that George was to get $60 a month for looking after the property. The transaction, therefore, according to the case

made by the defendants, was such as to reserve to the grantors a financial interest in it. The conveyances were followed with no change in apparent possession or enjoyment.

Second, the credibility of the testimony to transactions alleged to constitute valuable consideration. Lyla was born in April, 1904. In 1905, George and Nettie were induced by Nettie's father, who was then living in North Dakota, to remove to that state, where they bought a farm. Defendants' claim here is that Nettie's father furnished for the improvement of this farm $1,825, which, as George testifies, the father told them they could have the use of; "that the money he would make a present of to Lyla; and that we were to pay her this amount of $1,825, with a reasonable rate of interest, when she became of age, or 21 years. He used the words '21 years.'" Nettie gives substantially the same testimony. George says: "We expected this second child at this time, and I suppose Mr. Bidlack [the father] knew we did." Another child was shortly afterward born, and later two other children were born to George and Nettie. The claim of the defendants is that Lyla was a particular favorite of the grandfather's; but, as stated, Lyla was, at the time of this transaction, only about one year old, and the grandfather died in 1909, when she was only five years old. Lyla, though only five years old when her grandfather died, testifies:

"I remember him [the grandfather] more definitely when I was about five years old, on the occasion of his taking me back to Iowa from Dakota. I was always his favorite. I was with him almost constantly, as a mere child, until he died. When he took me back here, I was five years old, and I stayed one winter with him in Iowa, and he told me repeatedly that he had money that he had given papa to make use of till I got bigger, and he told me every day to impress it upon my memory that he had given this money to papa to use till I got bigger. He did not tell me the amount. He later told me the amount. It has been discussed in our home almost ever since I can remember. My grandfather died a short time after we got back from Dakota. I was about 10 or 12 years old when I first heard how much money it was, my grandfather had given my parents to be given to me. Grandmother Bidlack and my parents have told me that it was $1,825, with a reasonable amount of interest. Ever since I have

been a little girl, I have planned on getting this money, and have been told in the family that I was to have it."

The farm in Iowa referred to was purchased of the mother of George in 1917. Nettie testifies that they "needed some more money, to buy stock and things; and mother had $1,500 in bank in Manilla, that she was intending to give to Lyla, which we could have to use, to buy things, but we must give it back to her when she was 21 years old, at 6 per cent interest. My husband and I promised that we would. Lyla and mother and my husband and I were present. Lyla was about 14 years of age, and could understand it then. My mother died about four years ago. She left no will. I inherited these town properties, as the only child. I was made administratrix of my mother's estate. I was called upon, as administratrix, to learn whether anyone was her debtor. I did so, and I reported to the court that there were no persons who owed her any money. I regarded this money as being due Lyla, and not due my mother. I was present in August, 1924, when there was a discussion about finding some way that Lyla should get this money. We were not able to meet this obligation the next spring, and we took this way. Before Lyla went back to Lincoln, we made this arrangement with him [her?]: I would deed my property in Manilla, and the father would give her the property, in order to part pay her. The reason it wasn't cleared up before she went away was that her father and she had gone to Lincoln, in the first part of August, to find out about her being that [there?], and the board had to meet there first, and they did not know whether they would accept her or not; but she got a telegram to come right away, so she left. Until she got this telegram, she wasn't sure she was going anywhere. Then, when she received the telegram, she had to go, or lose the opportunity. When the time came to close up this transaction, I went with my husband to Shaw Van's office. We laid the case before them, and asked them all about it, and they said it was all right. * * * The Shaw Vans told us that that was a thing we could do. We figured that we were really giving Lyla a little better than $6,000. I know how it came that the lawyers did not put that amount in the deed. They told us that it was not necessary; that, as long as we owed this amount, that $100 [$1.00?] was just as good as any amount, and that, when it came to any question about it, we could show

our transaction." Defendants claim that Lyla lived with her maternal grandmother much of the time after the grandfather died. Lyla, at the time the conveyances in controversy were made, was 20, not 21, years old, and was attending a nursing school in Nebraska. Defendants' claim is that they had previously arranged the settlement with her. Lyla testifies:

"Papa said that their circumstances were such that he could not meet this debt any other way than to give me a bill of sale to his personal property and crop, and mamma to give me a deed to her property. They said that was the only way they could secure me. * * * I went to Green Gables about the 20th of August, because I received a telegram that I could go back in training there. After I went to Green Gables, I received a letter stating that they had carried out this thing between us. When we were talking it over, we knew that I might be away, and my father suggested that he take the property and farm with it, and that he would do it for $60 a month. He was to have this sum if they made it, or it was to be applied out of the rent, and if there was anything left, I was to get it. While I was at Green Gables, the folks sent me part of the money they got from rent, or off the farm. A nurse in training does not earn anything, so I had to have some money to get on with. I cannot tell you how much they sent me. They sent me at least spending money and for clothes. * * * The money would come in post-office money orders, sometimes as much as $35. There was no settlement at the time these letters were received. When I left in August, 1924, I went to Lincoln and stayed a year. I got no cash in that year. I had a settlement in August, 1925, and in that settlement, my father paid me some cash. I don't know that he told me the exact proceeds, and I do not know the exact amount. It did not square up the account to date. I still owed him about $200, as I remember. He paid me money, in spite of the fact that I was owing him, because I needed it."

The attorney John Shaw Van says that, in getting ready for this suit, he and the defendants George and Lyla looked up the drafts in the bank.

"We traced down, and finally found a draft for $1,500, which, if my memory serves me correctly, was made out to Mrs. Eva Bidlack; and on the back of the draft was shown where it

had been paid at the First National Bank of Denison, Iowa. That was the draft that Mr. Lochmiller claimed that he got.''

Neither the draft itself nor other evidence connects the defendants with it. The attorney does not refer to the charge that he put a nominal consideration in the deed because it was not necessary to put in the real consideration, and that ''$100 [$1.00?] was just as good as any amount.''

· · It is not ordinarily expected of family transactions that testimony of disinterested witnesses, either confirming or refuting that of the parties immediately concerned, may be obtained; but it does not follow from this alone that the interested testimony is, merely from the fact that it is not contradicted by direct evidence, to be accepted, or from the fact that it is not confirmed by such evidence, is to be rejected. The testimony must be subjected to the scrutiny of the triers of fact in the light of reason and common experience. Fraud is an offense of darkness. Its presence may be made known by well-known earmarks.

That the defendant debtors were moved to escape payment of the debt to plaintiff is, on this record, a well sustained inference. That their purpose was to shield their property from subjection to satisfaction of plaintiff's demand is indisputable; that the grantee was without means, and did not purchase the property in the usual course of business, or for any purposes of conducting therewith business, or of investment, are facts likewise incontestable. There is no evidence of the rental value of the real property. That a $2,500 property in the town of Manilla (population in 1920, 1,142) would rent for $300 per year, is not shown. If it would so rent, taxes, repairs, and insurance premiums would have to be provided for. There is no evidence as to any arrangement for or expectation of an income from the horses, cattle, and farm machinery. On the contrary, Lyla's testimony is that George was to ''take the property and farm with it,'' and he would do it for $60 a month. He was to have the use of the personal property and $60 a month,—$720 a year. The immediate financial interest in the transaction, therefore, was in the grantors, and for an indefinite time.

Defendant debtors were induced by the wife's parents to move to North Dakota. Nettie was the only child. It is reasonably to be supposed that the parents were desirous of helping her; but that in helping her they should require her to contract

to repay to a one-year-old grandchild in 20 years their advances, with interest, particularly when another grandchild was then in prospect, and others might reasonably be expected, does not commend itself as reasonable. Reasonableness is not aided by the claim that, a dozen years later, the grandmother, on finding that her daughter needed further aid, and granting it, should exact an agreement, and require in seven years the payment of an additional $1,500, with 6 per cent interest. That Lyla, one year old at the time of the original transaction, five years old at the time of her grandfather's death, testifies that her grandfather "told her repeatedly that he had money that he had given papa to make use of till I [she] got bigger," and that "he told me [her] every day to impress it upon my [her] memory that he had given this to papa to use till I [she] got bigger;" that she, ever since she was a little girl, had planned on getting this money, is so incredible as to utterly destroy her testimony. It is quite a remarkable coincidence that the two alleged advances, with interest, as computed by defendants, should approximate in amount the value of all their property which they should have several years later, and that the time of repayment should be so meticulously stipulated for a date that should approximate (though exceeding by several months) the time when it became necessary, in order to avoid payment of a debt, to make the transfer. The testimony of these defendants is not merely to an unusual, or even to an improbable, transaction. It is utterly incredible. The court in accepting such testimony would stultify itself, and put its stamp of approval upon transactions which the common sense of experienced men would accept as manifestly fabricated for the purpose of defrauding creditors.

On such a record, the deed and bill of sale here under attack must be held to be fraudulent as to existing creditors. See *First Nat. Bank v. Hartsock*, 202 Iowa 603; *Dimick v. Munsinger*, 207 Iowa 354, and cases there cited; *Coburn v. Davis*, 206 Iowa 649.—*Affirmed.*

ALBERT, C. J., and STEVENS, DE GRAFF, and WAGNER, JJ., concur.