C. W. SCHNURR, Trustee, Appellee, v. MATTHEW V. MILLER et al., Appellants.

No. 40498.

DECEMBER 9, 1930.

*M. F. Condon* and *W. A. Smith,* for appellants.

*Geiser, Donohue & Geiser,* for appellee.

DE GRAFF, J.—On August 24, 1928, the defendant Matthew V. Miller filed his voluntary petition in bankruptcy, and listed his unsecured creditors, whose claims aggregated $12,884. His filed petition listed no property of any kind or character, but at that time, there was personal property to the amount of several thousand dollars on the farm operated by him. The trustee had reason to believe, and so alleged in his petition filed January 2, 1929, that the said bankrupt is fraudulently claiming that all of the personal property located on the farm belongs to his wife, Mary D. Miller, but that there never has been a valid transfer of said property to his wife, Mary, and that if any transfer was made, the same was fraudulent, and entered into between the bankrupt and his wife with intent to hinder, delay, and defraud creditors of the bankrupt, and that Mary D. Miller holds the said property in trust for the said Matthew V. Miller. The bankrupt and his wife filed answer, and therein admitted that Matthew V. Miller has resided for more than 15 years last past on said farm, but expressly denied that he has operated and controlled said farm since June 1, 1924, and alleged that he has operated and conducted said farm since that date as the agent and manager for his wife, Mary, and alleged that all of the property on said farm is the property of Mary D. Miller. The issues thus joined present primarily a fact question, and the case necessarily gravitates around the date of June 1, 1924, at which time a certain contract, Exhibit 6, presently noted, was executed. We necessarily turn to the facts, to discover the applicable and controlling principles of law.

The farm to which reference has been made consisted of 240 acres. Matthew inherited 200 acres thereof from his father. The 40-acre tract was deeded to Mary by her father in 1914, when Matthew and Mary intermarried. At that time, the 240 acres were clear of encumbrance. Matthew conducted the operations on the 240 acres as a family affair. He tiled the 40-acre

tract owned by his wife, and improved it. During all the years prior to 1924, Matthew never paid any rental to his wife, Mary, for the use of the said 40, and made no charge against Mary for the tiling and the improvements made on said 40. There was no thought at any time during those years of keeping any account of any indebtedness to each other. It also appears that Matthew V. Miller was engaged extensively in buying and selling thoroughbred hogs. He became heavily in debt. He and his wife executed various mortgages to James Curran and the State Savings Bank of Lawler, to secure the indebtedness. The mortgages were taken in the name of Curran (president of the bank), as a matter of bank convenience. The transactions were in reality transactions with the State Savings Bank of Lawler. In May, 1924, James Curran, mortgagee, commenced an action to foreclose the mortgage on the 240-acre farm. On the trial thereof, Miller contested the appointment of a receiver. On June 9, 1924, a meeting was held at the State Savings Bank of Lawler, and there were in attendance the Millers and their attorney, F. A. Schuetz, cashier of the bank, James Curran, its president, and the bank's attorney. The indebtedness of the Millers to the bank was discussed, and as a result, the contract Exhibit 6 was entered into at that time between the Millers and James Curran. By the terms of that contract, President Curran, acting for the bank, was to dismiss the claim for the appointment of a receiver in the foreclosure action, and a decree of foreclosure was to be entered. The Millers were to remain on the farm and conduct the farm work. The Millers were to execute a new chattel mortgage to Curran for $9,500, and Curran paid to the Millers $200 for a one-half interest in certain small pigs and chickens on the farm. Miller was to furnish all machinery and personal property which was covered by the chattel mortgage, and was to manage and operate the farm. All produce sold from the farm was to be equally divided between the Millers and Curran, and each party was to own a half interest in all young stock raised from the time of the signing of the agreement. It was clearly a partnership arrangement, and so denominated in the contract. After the contract Exhibit 6 was executed, Matthew V. Miller carried his bank account in the name of Mary D. Miller, which change was decided by the Millers after the meeting in the bank. Mrs. Miller

testified that she had never talked with her husband about handling things that way until after the bank meeting, and stated that it had been suggested to her by different parties. She was then pressed to name the parties. She replied, "the cashier of the State Savings Bank of Lawler, the cashier of the First National Bank of Lawler, and several business men of Lawler." She further stated that the reason these parties told her to operate things that way was that they thought her husband lacked business judgment. On examination of Matthew with reference to this matter, the record discloses the following:

"Q. The first time that you ever thought of paying Mrs. Miller anything was in 1924 at the bank when this deal was worked out, wasn't it? A. I guess so. Q. You never kept any figures as to what you were owing Mrs. Miller on this 40 acres of land? A. No. Q. You considered that it was all your common property, and you were working that way during all the years that you and your wife were married? A. Yes. Q. And you never thought of keeping any account between yourselves of how much you owed Mrs. Miller or she was owing to you? A. No. Q. But in 1924, after everything went to pieces, you then started working out a plan to save yourselves, didn't you, and try to save some of the property,—isn't that true? A. I suppose. Q. And it was then that you decided to operate in your wife's name? A. Well, that's the agreement we had. Q. Did you ever stop to figure whether there was any indebtedness between the two of you? A. I don't know as we did. Q. You just decided to go ahead and work in Mrs. Miller's name from that time on? A. Yes, sir."

As a matter of fact, Matthew did continue, after Exhibit 6 was signed, to operate the farm the same as he had before, and until the partnership arrangement between the bank and him was dissolved, in October, 1926. It may further be stated that, in February, 1925, the personal property was assessed and the husband, Matthew, signed the assessment roll, under oath that it was a correct list of *his* taxable property. Again, in 1926, he listed the personal property on the farm as *his* taxable property. In October, 1926, it was decided by the bank and the Millers to discontinue the partnership arrangement. At this time there was due James Curran (or, more strictly, the bank) on the

$9,500 chattel mortgage the sum of $4,700. In October, 1926, Matthew V. Miller paid $1,700 on the chattel mortgage, and this payment represented the receipts from hogs sold on the farm during the month of October. Under the contract Exhibit 6, it was provided that, when the partnership agreement was dissolved, the Millers could either surrender the personal property to the bank or pay the balance due on the chattel mortgage, and the bank would then release the mortgage. In October, 1926, certain other property was listed and valued by the bank at $1,700, and the bank agreed to release it on payment of this amount. A new note and mortgage for $2,000 were signed by the Millers on October 29, 1926, for the balance due on the $9,500 mortgage executed June 9, 1924. There was still a number of hogs and cattle on the farm which had not been sold, and the new mortgage of $2,000 was given to secure the amount that would be derived when this property was sold. Subsequently, the property covered by the $2,000 mortgage was sold, and the entire indebtedness under the original $9,500 mortgage to Curran was released.

On March 1, 1927, the Millers occupied the farm under a lease from James Curran, paying rent on a cash basis. At this time, all of the personal property on the farm was free and clear of encumbrance. Miller continued to operate and conduct the farm for the years 1927 and 1928 by virtue of the lease heretofore mentioned. He continued to make purchases and sales. On August 24, 1928, he filed his voluntary petition in bankruptcy, and at that time, there was personal property on the farm which was valued at approximately $9,000. Miller testified on this trial that, on June 9, 1924, he did not have sufficient property to pay his creditors, and his wife, Mary, testified that, at the time she married Matthew, she had no money, and that in June, 1924, she had no money. There can be no question, under this record, that the arrangement between Matthew and his wife, Mary, was a mere makeshift. The only interest, if any Mary D. Miller had, might have been her right of redemption in the 40-acre tract, to which she held legal title. No claim is here made that there was any assignment or bill of sale conveying to Mary any of the personal property. There is no provision in the contract Exhibit 6 which in any manner transfers any interest in the personal property from Matthew to Mary. Matthew did

444

continue to operate and manage the farm, as he had always done. He made the purchases and sold the produce. There was no change in the possession or manner of handling the personal property, and no change which would put anyone on notice that there had been any transfer of ownership. See Section 10015, Code, 1927.

The facts in this case are quite analogous to those found in *Hamilton v. Lightner*, 53 Iowa 470, wherein it is said:

"Transactions of this kind are fraudulent as to creditors."

See, also, a quite similar case on the facts and the law, *Hamill & Co. v. Augustine*, 81 Iowa 302, wherein it is said:

"Purchases of either real or personal property made by the wife of an insolvent debtor during coverture are justly regarded with suspicion, unless it clearly appears that the consideration was paid out of her separate estate. Such is the community of interest between husband and wife * * * . In a contest between the creditors of the husband and wife, there is, and there should be, a presumption against her which she must overcome by affirmative proof."

The transaction in question is, of and by itself, the most satisfactory proof of fraud.

" 'The motives and intentions of parties can only be judged of by their actions and the nature and character of the transaction in which they are engaged. They often furnish more conclusive evidence than the most direct testimony.' " *First Nat. Bank v. Hartsock*, 202 Iowa 603.

There never was any transfer from the Millers to the bank of Lawler of the personal property in question, and Exhibit 6 provided that there was no personal liability on the part of the Millers beyond what the security thereunder would afford. Furthermore, there is no evidence worthy of serious consideration, of any transfer of this personal property from Miller to his wife, Mary. As heretofore pointed out, there was no agreement or expectation on the part of either Matthew or Mary that the indebtedness of each to the other should be repaid. Consequently, she was not the creditor of her husband, and such a sale, if made to her, was voluntary and invalid as against the trustee in bank-

ruptcy of the husband. *Harris v: Carlson*, 201 Iowa 169. See, also, *Carr v. Way*, 141 Iowa 245. The trustee in bankruptcy of Matthew V. Miller occupied the position of a judgment creditor, holding an execution unsatisfied as to all personal property on the farm of the bankrupt. United States Code Annotated, Title 11, Section 75, Bankruptcy Act; *Des Moines Joint Stock Land Bank v. Danson*, 206 Iowa 897, l. c. 906.

Matthew V. Miller was insolvent at the time of the assignment by him to his wife, and she knew of his insolvency. The burden was upon Mary to show, under the circumstances, that, at the time of the purported transfer, Matthew V. Miller had sufficient property remaining to pay his debts. *Dolan v. Newberry*, 200 Iowa 511.

Under the record, there is but one conclusion that can be reached, and that is that the entire transaction was a fraudulent scheme between Matthew V. and Mary D. Miller to defeat the creditors of Matthew V. Miller. The trial court was correct in its findings, and the decree entered must be, and is,—*Affirmed.*

MORLING, C. J., and STEVENS, ALBERT, and WAGNER, JJ., concur.